# Illinois Official Reports

## Appellate Court

---

***State v. American Federation of State, County, & Municipal Employees, Council 31***,
**2014 IL App (1st) 130262**

---

| | |
|---|---|
| Appellate Court Caption | THE STATE OF ILLINOIS (The Department of Central Management Services), Plaintiff-Appellant and Cross-Appellee, v. AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, COUNCIL 31, Defendant-Appellee and Cross-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-13-0262 |
| Filed | September 30, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the State's complaint to vacate an arbitrator's award in favor of a union representing state employees requiring the State to pay the employees' wages that had not yet been appropriated, the trial court's order vacating and modifying in part the arbitrator's award by permitting the State to present evidence that several agencies did not have sufficient funds to comply with the arbitrator's order and allowing the State to delay payment beyond the time frame permitted by the award was reversed and the cause was remanded with directions to confirm the arbitrator's award, since the award arose from the parties' arbitration agreement and was in accord with the Illinois public policy favoring the enforceability of contracts and the negotiation of binding, multiyear contracts between public employees' unions and the State. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 11-CH-25352, 11-CH-31951; the Hon. Richard Billik, Jr., and the Hon. Rodolfo Garcia, Judges, presiding. |
| Judgment | Reversed and remanded with directions. |

| Counsel on Appeal | Laner Muchin, Ltd., of Chicago (Joseph M. Gagliardo, Thomas S. Bradley, and Lawrence J. Weiner, Special Assistant Attorneys General, of counsel), for appellant. |
|---|---|
| | Cornfield & Feldman LLP, of Chicago (Stephen A. Yokich, of counsel), for appellee. |
| | Mitchell Roth, General Counsel, of Chicago, *amicus curiae* Illinois Education Association. |
| | Sean Smoot, Director and Chief Legal Counsel, of Chicago, *amicus curiae* Policemen's Benevolent and Protective Association. |
| | Carmel, Charone, Widmer, Moss & Barr Ltd., of Chicago (Susan Matta and William Widmer, of counsel), for *amicus curiae*. |
| Panel | JUSTICE NEVILLE delivered the judgment of the court, with opinion. Presiding Justice Simon and Justice Pierce concurred in the judgment and opinion. |

## OPINION

¶ 1     The State of Illinois filed a complaint to vacate an arbitrator's award entered in favor of a union of state employees. The trial court vacated the arbitrator's award in part and permitted the State to present evidence in support of its claim that several of its agencies lacked sufficient funds to comply with the arbitrator's award. The court ordered the State to pay its employees amounts due under the State's agreements with the union, but the court permitted the State to delay payment beyond the time frame permitted by the arbitrator's award. The State appeals from the judgment, arguing that the document signed by an agent for the State and an agent for the union imposed no obligation on the State, because in the document the State's agent purported to commit the State to paying amounts the General Assembly had not yet appropriated. The union cross-appeals from the judgment, arguing that the trial court should have confirmed the arbitrator's award.

¶ 2     We find that the arbitrator's award drew its essence from the arbitration agreement, and the award accords with Illinois public policy favoring the enforceability of contracts and the negotiation of binding, multiyear contracts between the State and unions of public employees. We reverse the trial court's order and remand for entry of an order confirming the arbitrator's award.

¶ 3                                                       BACKGROUND

¶ 4         In 2008, the State of Illinois, through its Department of Central Management Services (CMS), agreed to a four-year collective bargaining agreement (CBA) with the American Federation of State, County and Municipal Employees (AFSCME). The CBA required the State to increase the wages of AFSCME members by 1.5% on January 1, 2009, 2.5% on July 1, 2009, 2% on January 1, 2010, 2% on July 1, 2010, 2% on January 1, 2011, 4% on July 1, 2011, and a further 1.25% on January 1, 2012. The CBA provided:

> "Should any part of this Agreement *** be Judicially determined to be contrary to law, such invalidation of such part or provision shall not invalidate the remaining portions hereof ***. The parties shall attempt to renegotiate the invalidated part or provisions. The parties recognize that the provisions of this contract cannot supersede law."

¶ 5         In the CBA, the parties also agreed to use a grievance process to resolve disputes. For grievances that reached arbitration, the CBA established arbitration procedures, and it specified that "[t]he arbitrator shall neither amend, modify, nullify, ignore, add or subtract from the provisions of this Agreement."

¶ 6         In the summer of 2009, Governor Pat Quinn directed 10 state agencies to lay off a total of 2,500 employees, with the layoffs to take effect early in fiscal 2010. AFSCME filed a grievance to contest the layoffs. AFSCME and the State, through CMS, agreed to present the matter to arbitrator Ed Benn for resolution. With Benn's assistance, the parties reached a mediated resolution on January 26, 2010, signed by agents for the union and the State. Under the mediated resolution, the State agreed to lay off only 1,200 employees, while closing 4 state-run facilities and deferring the wage increases set in the CBA. The measures to which AFSCME agreed saved the State about $300 million, far exceeding the $115 million the State expected to save from the proposed 2,500 layoffs.

¶ 7         Later in 2010, Governor Quinn sought further concessions from the union. The parties signed several cost savings agreements (CSAs) in the fall of 2010. The first such agreement set a goal of finding budgetary savings of $100 million, and named Benn as the agreed arbitrator for any disputes arising under the CBA and the CSAs. By early November 2010, the parties identified sufficient savings, and in a second CSA the State's agent agreed that "there shall be no temporary or indeterminate layoffs through the end of [fiscal year] 2012 (June 30, 2012), nor shall the State close any facilities prior to July 1, 2012." AFSCME agreed to yet more deferrals of the wage increases set in the CBA, unpaid furloughs, reduction of overtime, and other cost reductions. AFSCME's members ratified the CSAs, and the State began to realize the savings under the CSAs.

¶ 8         On February 16, 2011, Governor Quinn introduced to the General Assembly a proposed budget for fiscal year 2012. The proposed budget included sufficient appropriations to fund the State's promises under the CBA, as modified by the CSAs. The General Assembly rejected parts of the proposed budget. In May 2011, the General Assembly adopted its budget appropriating funds for fiscal year 2012 to all the state agencies, with specific amounts for specific categories of expenses. CMS reviewed the budget and determined that the appropriations for paying employees at 14 agencies would not suffice to meet the State's commitments under the CBA and the CSAs. CMS froze the pay for its employees for those 14 agencies at the amounts paid during fiscal year 2011. Employees at all other state agencies began receiving the negotiated pay raises.

¶ 9        In July 2011, AFSCME sought arbitration of the dispute arising under the CSAs. AFSCME argued that in the CSAs the State promised to pay the delayed 2% increase in wages for AFSCME members. The State answered that the Illinois Public Labor Relations Act (Act) (5 ILCS 315/1 *et seq.* (West 2008)) established that it owed no duty to pay any state employees any wages until the General Assembly appropriated sufficient funds to pay the wages. According to the State, if the General Assembly decided to appropriate no funds to pay employees, allocating all appropriations in other ways, the State would owe its employees nothing.

¶ 10       Benn issued his award on July 19, 2011. Benn noted that the State argued, in effect, that the CBA and the CSAs, interpreted in light of the Act, meant that the State promised to pay its employees "only if there are sufficient appropriations by the General Assembly." Benn found that the express provisions of the CBA, limiting the power of arbitrators, forbade him from adding that language to the CBA and the CSAs. The CSAs, by their own terms, required the State to pay the agreed wages to AFSCME members, including the negotiated 2% increases. Accordingly, Benn found that the State breached the CBA and the CSAs when it failed to pay the agreed wages to employees of the 14 agencies.

¶ 11       Regarding the Act, Benn said:

> "I am an arbitrator whose authority flows strictly from the terms of the collective bargaining agreement. I am not a judge with authority to interpret statutory provisions. ***
>
> *** The parties did not specifically make Section 21 [of the Act] part of the [CBA] or the [CSAs]. As an arbitrator, I therefore have no authority to interpret that statutory provision. Statutory interpretations must be made by the courts and not by arbitrators."

¶ 12       Benn added that the CBA did not permit him to add language to the CBA or the CSAs based on his interpretation of the Act. Benn refused to address constitutional and public policy issues the State raised, as Benn found that resolution of those issues exceeded the scope of the authority the CBA and CSAs conferred on him. Benn ordered the State to pay the agreed wages, including the 2% wage increases for fiscal year 2012.

¶ 13       The State promptly filed a complaint to vacate Benn's award on public policy grounds and an emergency motion to stay the award. The trial court granted the stay. The General Assembly made supplemental appropriations, and several agencies experienced sufficient attrition to allow them to pay the wage increases Benn ordered. Eventually, the State paid the ordered wages to employees in all but six agencies. The remaining agencies affected by the wage freeze are the Department of Corrections, the Department of Human Services, the Department of Public Health, the Department of Natural Resources, the Department of Juvenile Justice, and the Human Rights Commission (collectively, the affected agencies).

¶ 14       The trial court agreed with the State that an overriding public policy made the CBA and the CSAs invalid, unless the General Assembly appropriated to each agency sufficient funds to pay the amounts due under the CBA and the CSAs. The court then held evidentiary hearings on the availability of appropriated funds for the affected agencies.

¶ 15       On December 10, 2012, the court held that the affected agencies had proven that they lacked sufficient appropriations to pay in full the wages agreed in the CBA as modified by the CSAs, but the agencies had not proven an inability to pay partial increases over fiscal year 2011 wages. The court ordered the State to pay the wages, including partial increases, to the

extent the appropriated funds permitted. The court added that the State still had an obligation under the CBA and the CSAs to pay in full the agreed amounts, even if the agencies needed to use fiscal year 2013 appropriations to pay the agreed 2012 wages.

¶ 16 The State appealed from the order, challenging the holding that it had an obligation to pay the agreed wages. AFSCME cross-appealed from the order, challenging the ruling insofar as the court vacated in part Benn's order. Negotiators acting on behalf of the State subsequently agreed with AFSCME representatives concerning payments due under the court's order, and the State's negotiators agreed to withdraw the State's appeal from the court's order. After AFSCME members ratified the agreement, the Attorney General informed AFSCME that she would not consent to withdrawal of the appeal. However, the State paid the wages as agreed, in accord with the trial court's order. AFSCME again ratified the agreement, despite the Attorney General's decision to pursue the appeal.

¶ 17 <center>ANALYSIS</center>
¶ 18 <center>Mootness</center>
¶ 19 Neither party suggests that the State's payments in accord with the court's order moots the appeal. We address the issue of mootness because of our duty to determine whether this court retains jurisdiction to decide the appeal. *Circle Management, LLC v. Olivier*, 378 Ill. App. 3d 601, 607 (2007). We agree with the parties that the payments do not make the case moot, because "[a]gency compliance with the Court of Appeals' mandate does not moot the issue of the correctness of the court's decision." *Norfolk & Western Ry. Co. v. American Train Dispatchers' Ass'n*, 499 U.S. 117, 128 n.3 (1991).

¶ 20 <center>Court's Interest</center>
¶ 21 Neither party questioned the propriety of this court deciding the appeal in this case. Staff members working for all of the judges in this case belong to AFSCME, and the CBA at issue governs their relationship with the State. However, all judges in the state face the same conflict of interest. In this case, as in *Jorgensen v. Blagojevich*, 211 Ill. 2d 286, 298-99 (2004), "[w]ere we to recuse ourselves, the parties would therefore be left without a forum in which to review the circuit court's judgment. Their right to appeal would be lost. Under these circumstances, the common law 'rule of necessity' obligates us to proceed."

¶ 22 <center>Standard of Review</center>
¶ 23 The State argues that we should vacate the arbitrator's award because Benn's decision did not draw its essence from the CBA, and because the order violates Illinois public policy. The General Assembly expressly incorporated the Uniform Arbitration Act (710 ILCS 5/1 *et seq.* (West 2008)) into the Act (5 ILCS 315/8 (West 2008)). The Act "reflects the legislature's intent *** to provide finality for labor disputes submitted to arbitration." *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 304 (1996) (*AFSCME v. CMS*). Accordingly:

> "[T]he judicial review of an arbitral award is extremely limited. *** The Act contemplates judicial disturbance of an award only in instances of fraud, corruption, partiality, misconduct, mistake, or failure to submit the question to arbitration. ***

<center>- 5 -</center>

To this end, any question regarding the interpretation of a collective-bargaining agreement is to be answered by the arbitrator. Because the parties have contracted to have their disputes settled by an arbitrator, rather than by a judge, it is the arbitrator's view of the meaning of the contract that the parties have agreed to accept. We will not overrule that construction merely because our own interpretation differs from that of the arbitrator." *AFSCME v. CMS*, 173 Ill. 2d at 304-05.

¶ 24 The court "will review an arbitrator's contract interpretation only to determine if the arbitrator's award drew its essence from the agreement so as to prevent a manifest disregard of the agreement between the parties." *Board of Trustees of Community College District No. 508 v. Cook County College Teachers Union, Local 1600*, 102 Ill. App. 3d 681, 683 (1981). A federal court held that an arbitrator's award draws its essence from the collective bargaining agreement "if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award." *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir. 1969).

¶ 25 However, courts retain the power to vacate arbitral awards, even if the awards derive their essences from collective bargaining agreements, if the awards violate established norms of public policy. *AFSCME v. CMS*, 173 Ill. 2d at 306-07.

¶ 26                    The Arbitrator Did Not Consider Public Policy

¶ 27 The State first asks us to vacate the arbitrator's award because Benn expressly refused to consider the State's public policy arguments for ignoring the words of the CBA and the CSAs. The State bases its argument on *AFSCME v. CMS*, 173 Ill. 2d 299. In *AFSCME v. CMS*, the arbitrator held that the CBA required CMS to reinstate a child welfare specialist, despite the specialist's falsification of progress reports for children and her failure to compile required family service plans. The *AFSCME v. CMS* court noted that the arbitrator in that case

"avoided discussion of the charges ***. He did not take any precautionary steps to ensure the misconduct at issue here will not be repeated, and he neither considered nor respected the pertinent public policy concerns that arose from them. Thus, the remedy in this case violates public policy in that it totally ignores any legitimate public policy concerns." *AFSCME v. CMS*, 173 Ill. 2d at 317-18.

¶ 28 The *AFSCME v. CMS* court then held that the violation of public policy made the award unenforceable, despite the fact that it drew its essence from the collective bargaining agreement. The court said:

"As with any contract, a court may not enforce a collective-bargaining agreement in a manner that is contrary to public policy. Accordingly, if an arbitrator construes such an agreement in a way that violates public policy, an award based on that construction may be vacated by a court. [Citation.] Questions of public policy, of course, are ultimately left for resolution by the courts. *** We believe the public policy identified above is violated by the arbitral award in this case. That award cannot be said to in any way promote the welfare and protection of children." *AFSCME v. CMS*, 173 Ill. 2d at 318.

¶ 29    The *AFSCME v. CMS* decision does not make the arbitrator responsible for deciding questions of public policy. The contract for arbitration defines the arbitrator's authority, and if that contract does not permit the arbitrator to consider questions of public policy, he should not consider questions of public policy. See *Board of Trustees of Community College District No. 508 v. Cook County College Teachers Union, Local 1600*, 74 Ill. 2d 412, 420 (1979). As the *AFSCME v. CMS* court held, the courts reviewing arbitration awards bear ultimate responsibility for deciding questions of public policy. *AFSCME v. CMS*, 173 Ill. 2d at 318. Benn's refusal to consider the State's public policy argument does not warrant rejection of the arbitral award.

¶ 30                              Essence of the Award

¶ 31    Next, the State argues that the award does not draw its essence from the CBA because Benn ignored the CBA's clause which said that the "provisions of this contract cannot supersede law." The State contends that the CBA and CSAs, as Benn interpreted them, supersede section 21 of the Act, which provides: "Subject to the appropriation power of the employer, employers and exclusive representatives may negotiate multi-year collective bargaining agreements pursuant to the provisions of this Act." 5 ILCS 315/21 (West 2008). According to the State, this sentence means that the State's duties under its collective bargaining agreements always remain subject to the General Assembly's appropriation power.

¶ 32    The Act makes the CBA subject to the appropriation power of the employer. The Act defines "employer" as

> "the State of Illinois; any political subdivision of the State, unit of local government or school district; authorities including departments, divisions, bureaus, boards, commissions, or other agencies of the foregoing entities; and any person acting within the scope of his or her authority, express or implied, on behalf of those entities in dealing with its employees. \*\*\*
>
> 'Public employer' or 'employer' as used in this Act, however, does not mean and shall not include the General Assembly of the State of Illinois \*\*\*." 5 ILCS 315/3(o) (West 2008).

¶ 33    We cannot reconcile the State's interpretation of section 21 of the Act with the definitions in the Act, which expressly exclude the General Assembly from the list of employers to whose appropriation power the CBA remains subject. The State admits that none of the 14 agencies have any appropriation power. We cannot accept the State's invitation to ignore the explicit definition of the term, "employer." See *Board of Education v. A, C & S, Inc.*, 131 Ill. 2d 428, 468-69 (1989). We hold that the Act does not make the CBA subject to the General Assembly's appropriation power.

¶ 34    The State also argues that the CBA and the CSAs, as Benn interpreted them, supersede article VIII of the Illinois Constitution of 1970, which provides that "[t]he General Assembly by law shall make appropriations for all expenditures of public funds by the State." Ill. Const. 1970, art. VIII, § 2(b). Under the State's interpretation of the CBA and article VIII, the CBA imposed no binding obligation on the State, because the General Assembly had not appropriated funds for the promises the State made in the CBA. If Benn accepted the State's interpretation of the CBA, Benn would completely rewrite the CBA and the CSAs as documents with no binding effect on either party, despite the language of contractual promise in all the documents. As Benn observed, the CBA expressly limited his powers and did not

- 7 -

permit him to rewrite the CBA and the CSAs, nor did it permit him to ignore the promises therein. We find no indication that fraud, corruption, partiality, misconduct, or mistake affected the arbitral award, and the arbitrator addressed all questions properly submitted to arbitration in accord with the CBA. See *AFSCME v. CMS*, 173 Ill. 2d at 304. Accordingly, we find that the arbitrator's award drew its essence from the CBA and the CSAs. See *Griggsville-Perry Community Unit School District No. 4 v. Illinois Educational Labor Relations Board*, 2013 IL 113721, ¶ 20.

¶ 35                                                    Public Policy

¶ 36        The State also advances the related contention that the arbitrator's award violates Illinois public policy as expressed in the Illinois Constitution. According to the State, Illinois public policy forbids the State from negotiating any contracts that require payment of funds the General Assembly has not appropriated. When the State negotiated the CBA in 2008, the General Assembly had not made appropriations for fiscal year 2012. When the State negotiated the CSAs in 2010, the General Assembly still had not made appropriations for fiscal year 2012. The State claims that the CBA and the CSAs have no binding force, and do not constitute contracts between AFSCME and the State, because the State, in those documents, in violation of the constitution, purported to promise to make expenditures of public funds that the General Assembly had not yet appropriated. But the constitution also states as a basic public policy that "No *** law impairing the obligation of contracts *** shall be passed." Ill. Const. 1970, art. I, § 16. The State argues that the General Assembly's refusal to appropriate funds in accord with the CBA and the CSAs does not impair the State's obligation under the CBA and the CSAs because the State had no obligation to fulfill the promises its authorized representatives made in those documents.

¶ 37        The State's interpretation of public policy brings that policy into direct conflict with the Act, which expressly provides that the State and its agencies "may negotiate multi-year collective bargaining agreements" with unions of state employees. 5 ILCS 315/21 (West 2008). The State interprets public policy to foreclose the State and its agencies from effectively committing themselves to paying union members any amount prior to the General Assembly's appropriation of funds to the State and its agencies. But the General Assembly does not appropriate funds before the fiscal year preceding the year for which it appropriates funds. Thus, under the State's interpretation of public policy, the State and its agencies cannot promise unions anything that requires funding for future years. The State's interpretation of public policy as expressed in the Illinois Constitution forecloses the possibility of enforceable multiyear contracts, contrary to the Act.

¶ 38        In *AFSCME/Iowa Council 61 v. State*, 484 N.W.2d 390 (Iowa 1992), the Iowa Supreme Court faced a similar argument concerning the need for appropriations before a union could enforce a collective bargaining agreement. The trial court entered an order requiring the state to pay its employees the amounts it promised in a collective bargaining agreement, despite the lack of appropriations. The State of Iowa argued that the court's order "violate[d] the Constitution's appropriation clause, its doctrine of separation of powers and its prohibition against undue delegation of duties." *Iowa Council 61*, 484 N.W.2d at 393. The state contended that "its power to withhold appropriations must be read into every state contract." *Iowa Council 61*, 484 N.W.2d at 393. The Iowa court said:

"At the most basic level the State contends a contract with it is not really a contract, or, if it is labeled a contract, the State need not perform. This argument rests on a number of disputed applications of settled constitutional and statutory rules. The question is: Can the government be made to perform in accordance with its contracts, or is the other party, by reason of constitutional and statutory rules intended to protect the public treasury, left to the vagaries of the political process? We think the State can indeed be required to comply.

A second question is whether the State can avoid liability on this contract on the basis of an escape clause in the statute which forms a part of the contract. The answer is no–not on these facts. This is because the clause does not allow the State to avoid its contractual liability merely by selecting spending priorities under its exclusive control. ***

* * *

*** Whatever strengths could be perceived in the State's position simply cannot be used to frustrate its contractual obligations. ***

*** In *Perry v. United States*, 294 U.S. 330, 353 n.3 *** (1935), the United States Supreme Court quoted with approval the following eighteenth century authority:

'[W]hen a government enters into a contract with an individual, it deposes, as to the matter of the contract, its constitutional authority, and exchanges the character of legislator for that of a moral agent, with the same rights and obligations as an individual. Its promises may be justly considered as excepted out of its power to legislate unless in aid of them. It is in theory impossible to reconcile the idea of a promise which obliges, with a power to make a law which can vary the effect of it.'

*Id.* (quoting Hamilton: *Communication to the Senate*, January 20, 1795).

If we possessed the power to fashion a different rule for Iowa law, a power we very much doubt we have, we would not do so. It would be no favor to the State to exonerate it from contractual liability. To do so would seriously impair its ability to function. A government must finance its affairs, must contract for buildings, highways, and a myriad of other public improvements and services. It would lead to untenable results if a government, after having contracted for needed things, did not have to pay for them."

*Iowa Council 61*, 484 N.W.2d at 391-94.

¶ 39    Like the State of Iowa in *Iowa Council 61*, the State of Illinois here argues that if the General Assembly chooses to appropriate all its funds to specific purposes other than the payments of amounts the State's agents agreed to pay state employees, then the State owes its employees nothing. Such an interpretation of the CBA and the CSAs, as documents that commit the State to nothing, cannot stand. The State's interpretation of the General Assembly's appropriation power would allow the General Assembly in every appropriation bill to impair the State's obligations under its contracts. We adopt the reasoning of the Iowa Supreme Court in *Iowa Council 61*. The State, through its authorized agents, may commit the State to pay parties who enter into contracts with the State, even before the General Assembly has appropriated funds for the contract. *Iowa Council 61*, 484 N.W.2d at 394; see also *Association of Surrogates & Supreme Court Reporters v. New York*, 940 F.2d 766, 771 (2d Cir. 1991). If the State seeks to make the contract contingent on appropriation, it must make that contingency explicit in the contract. See *Carlstrom v. State*, 694 P.2d 1, 4 (Wash. 1985).

¶ 40    We hold that the arbitrator's award comports with the overriding public policy of permitting the State to negotiate enforceable multiyear collective bargaining agreements with unions of state employees, and the award furthers the express constitutional policy forbidding the General Assembly from passing any acts, including insufficient appropriation bills, that impair the obligation of contracts. Accordingly, we deny the State's appeal.

¶ 41                                              Cross-Appeal

¶ 42    AFSCME, in its cross-appeal, argues that the trial court should not have vacated the arbitrator's award in part. Because the arbitrator's award draws its essence from the CBA and the CSAs, and because the award does not offend Illinois public policy, we hold that the trial court had no adequate basis for modifying the arbitrator's award. We reverse the trial court's decision insofar as the trial court vacated the award in part and modified the award. We remand for the circuit court to confirm the arbitrator's award.

¶ 43    Reversed and remanded with directions.