# Illinois Official Reports

## Supreme Court

---

***State v. American Federation of State, County & Municipal Employees, Council 31**, 2016 IL 118422*

---

Caption in Supreme Court:

THE STATE OF ILLINOIS (The Department of Central Management Services), Appellant, v. AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 31, Appellee.

Docket No.          118422

Filed                     March 24, 2016
Rehearing denied    May 23, 2016

Decision Under Review

Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Richard J. Billik, Jr., and the Hon. Rodolfo Garcia, Judges, presiding.

Judgment           Judgments reversed.

Counsel on Appeal

Lisa Madigan, Attorney General, of Springfield (Carolyn E. Shapiro, Solicitor General, and Richard S. Huszagh, Assistant Attorney General, of Chicago, of counsel), for appellant.

Stephen A. Yokich, of Dowd, Block, Bennett, Cerrone, Auerbach & Yokich, of Chicago, for appellee.

Joel Abbott D'Alba, of Asher, Gittler & D'Alba, Ltd., of Chicago, for *amicus curiae* Illinois AFL-CIO.

Justices                 JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Freeman, Thomas, Karmeier, and Burke concurred in the judgment and opinion.

Justice Kilbride concurred in part and dissented in part, with opinion.

## OPINION

¶ 1      This case arises out of the entry of an arbitration award directing the State of Illinois to pay a 2% wage increase to state employees covered by a multiyear collective bargaining agreement between the State of Illinois; Department of Central Management Services (the State); and the American Federation of State, County and Municipal Employees, Council 31 (AFSCME).

¶ 2      For the reasons discussed below, we hold that the arbitration award violates Illinois public policy, as reflected in the appropriations clause of the Illinois Constitution (Ill. Const. 1970, art. VIII, § 2(b)), and section 21 of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/21 (West 2014)). Accordingly, we reverse the judgments of the appellate court (2014 IL App (1st) 130262) and the circuit court of Cook County and vacate the arbitration award.

¶ 3                                  BACKGROUND

¶ 4      AFSCME is the exclusive bargaining representative for approximately 40,000 state employees working in more than 50 departments, authorities, boards, and commissions under the authority of the Governor (collectively, executive agencies). In 2008, AFSCME and the State negotiated a multiyear collective bargaining agreement governing those employees' wages, hours, and conditions of employment. The agreement was effective September 5, 2008, through June 30, 2012, spanning almost four fiscal years.[1] Article XXXII of the agreement provided for a general wage increase on January 1, 2009, and thereafter on every July 1 and January 1, with the final increase on January 1, 2012. The individual wage increases varied in amount, but over the life of the agreement the wage increases totaled 15.25%. The underlying dispute in the present case involves the 4% wage increase that was scheduled to go into effect on July 1, 2011.

¶ 5      In addition to the wage increases, the parties agreed, pursuant to article V of the collective bargaining agreement, to resolve certain disputes, including contract interpretation disputes, through binding arbitration. The parties also agreed, as set forth in article XXXIV, that the provisions of the collective bargaining agreement "cannot supersede law."

¶ 6      In January 2010, in the face of declining state revenues owing to the Great Recession, and the potential layoff of 2,500 state employees, AFSCME and the State agreed to $300 million in cost savings measures. The parties' written agreement limited the number of employees subject to layoff, limited facility closures during fiscal year 2011, deferred a portion of the wage increases scheduled to go into effect during fiscal year 2011, and set a target date for agreement on a voluntary furlough program.

---

[1]The State's fiscal year runs from July 1 through June 30. Thus, the 2012 fiscal year, for example, would run from July 1, 2011, through June 30, 2012.

¶ 7    In the fall of 2010, in recognition of the yet ongoing fiscal crisis facing the State, the parties entered into two cost savings agreements that established a $100 million savings goal for fiscal year 2012. Among other things, AFSCME agreed to a partial deferral of the wage increase scheduled to go into effect on July 1, 2011. Rather than the 4% increase reflected in the collective bargaining agreement, a 2% increase would be implemented on July 1, 2011, with the remaining 2% increase to be implemented on February 1, 2012. The State, in turn, agreed that no layoffs or facility closures would occur through the end of fiscal year 2012. The cost savings agreements expressly provided that arbitrator Edwin Benn would be retained to decide any disputes relative to the agreements.[2]

¶ 8    The Governor's proposed budget for fiscal year 2012, submitted to the General Assembly in February 2011, sought appropriations that would have fully funded the wage increases reflected in the CBA. The General Assembly's subsequent appropriation bills were, in fact, sufficient for that purpose with respect to the vast majority of executive agencies. As to 14 agencies, however, the Governor's Office of Management and Budget (GOMB) determined that the legislative appropriations were insufficient to pay the 2% wage increase.[3]

¶ 9    On July 1, 2011, immediately after adoption of the fiscal year 2012 budget, the acting director of the Department of Central Management Services (CMS) issued a memorandum advising agency directors, personnel and payroll managers, and labor relations administrators that, due to insufficient appropriations, the wage increase could not be implemented in those 14 agencies. The memorandum explained:

"Pursuant to the Illinois Constitution, the General Assembly possesses the sole authority to make appropriations for all expenditures of public funds by the State. Additionally, [section 21 of ] the Illinois Public Labor Relations Act *** states, '*[s]ubject to the appropriation power of the employer*, employers and exclusive representatives may negotiate multi-year collective bargaining agreements pursuant to the provisions of this Act.'

The Governor's proposed budget to the General Assembly sought to fully fund all collective bargaining contracts. However, the budget that was passed by the General Assembly and sent to the Governor DOES NOT contain appropriation authority to implement *** increases for employees [in 14 agencies] covered by [the CBA]." (Emphasis in original.)

¶ 10    AFSCME thereafter initiated a labor arbitration before the parties' designated arbitrator. The arbitrator directed the parties to brief the effect of section 21 of the Act on their dispute.

¶ 11    The State argued that section 21 mandates that expenditures by the executive branch pursuant to a collective bargaining agreement are contingent on the existence of corresponding

---

[2]For ease of discussion, we will refer to the collective bargaining agreement, together with the cost savings agreements, as simply the "CBA."

[3]These agencies were: the Department of Corrections, the Department of Juvenile Justice, the Department of Human Services, the Department of Revenue, the Department of Human Rights, the Department of Public Health, the Department of Labor, the Department of Natural Resources, the Human Rights Commission, the Criminal Justice Information Authority, the Deaf and Hard of Hearing Commission, the Guardianship and Advocacy Commission, the Prisoner Review Board, and the Historic Preservation Agency.

appropriations by the General Assembly and that this provision simply restates the mandate contained in the appropriations clause of the Illinois Constitution. The State further argued that section 21 of the Act was incorporated into the CBA by virtue of the parties' express agreement, set forth in article XXXIV of the CBA, that "the provisions of this contract cannot supersede law."

¶ 12        AFSCME argued that the very purpose of the Act was to expand the collective bargaining rights of public employees. Thus, section 21 should not be read to "cut back" on such rights by making collective bargaining agreements subject to the approval of the General Assembly.

¶ 13        On July 19, 2011, the arbitrator issued an award in favor of AFSCME. Based strictly on the four corners of the CBA, the arbitrator found that the State violated the CBA when it failed to pay the 2% wage increase on July 1, 2011. The arbitrator directed the State to begin paying the wage increase immediately and, within 30 days from the date of the award, "to make whole" those employees who did not receive the wage increase on July 1, 2011.[4] As to section 21 of the Act, the arbitrator determined that he was without authority to interpret this statutory provision, that being a matter for the courts. The arbitrator also declined to consider the State's constitutional and public policy arguments, again citing his lack of authority.

¶ 14        The State filed a complaint in the circuit court of Cook County to vacate the arbitration award. AFSCME, in turn, filed a counterclaim to confirm the award. The parties stipulated that during the pendency of the case, the GOMB had determined that, "as a result of attrition, lower than anticipated overtime, and the shifting of some staff payroll from the General Revenue Fund to other funding sources," 4 of the 14 agencies now had sufficient appropriations to pay the wage increases for fiscal year 2012 retroactive to July 1, 2011. Thus, the parties' dispute focused on the remaining 10 agencies.

¶ 15        On July 9, 2012, the circuit court entered its order vacating the arbitration award in part. Although the circuit court agreed with the arbitrator that the State was under a contractual obligation to pay the wage increase, the circuit court determined that section 21 of the Act, when considered in conjunction with the appropriations clause, is indicative of a well-defined and dominant public policy that prohibits the expenditure of public funds where authority to do so, *i.e.*, a sufficient appropriation, is lacking. The circuit court also determined that the applicability of this public policy was fact-dependent. That is, in order to excuse the State's obligation under the CBA to pay the wage increase, the State must establish that the appropriations to the remaining 10 executive agencies were, in fact, insufficient. The circuit court remanded the matter to the arbitrator for such fact-finding. The arbitrator, however, declined to consider the matter further, and the parties agreed to proceed before the circuit court. Thereafter, four more agencies determined that they were able to pay the wage increase with their remaining appropriations. Accordingly, the parties proceeded to trial on the issue of whether the appropriations to the six remaining agencies were sufficient to pay the 2% wage increase.[5]

---

[4]The State estimated that the cost of paying the wage increase to employees in the 14 affected agencies was $75 million.

[5]The six remaining agencies were: the Department of Human Services, the Department of Corrections, the Department of Juvenile Justice, the Department of Public Health, the Department of Natural Resources, and the Human Rights Commission.

¶ 16    The State offered testimony from Robert Brock, budget director for the Department of Human Services; Rob Craddock, deputy director over the labor relations function for CMS; Marc Staley, associate director of the GOMB; and Bryan Geckler, chief financial officer for the Department of Corrections. Additionally, the parties filed 326 joint stipulations and numerous exhibits related to the legislative appropriations to the subject agencies.

¶ 17    After considering the evidence, the circuit court entered its written ruling on December 10, 2012. The circuit court found that the State had established that it "cannot pay the full amount of the wage increases at this time, but has not established that it cannot pay a lesser amount of the wage increases pursuant to its contractual obligations to do so." The circuit court reinstated and confirmed the arbitrator's award, with the exception that the State was "not required to pay all of the wage increases within 30 days." The circuit court ordered that, to the extent expiring appropriations for fiscal year 2012 were not adequate to pay the wage increases in total, the State's "contractual obligation remains unsatisfied and continues until paid in full." The circuit court expressly stated that state employees who did not receive the 2% wage increase may file back wage claims from the "back wage fund" under applicable law.[6]

¶ 18    The State appealed, seeking vacatur of the arbitration award; AFSCME cross-appealed seeking confirmation of the award *in toto*.

¶ 19    The appellate court held that the arbitrator's award drew its essence from the CBA, rejecting the State's argument that under section 21 of the Act, the CBA was subject to the appropriation power of the General Assembly. 2014 IL App (1st) 130262, ¶¶ 30-34. The appellate court also held:

> "[T]he arbitrator's award comports with the overriding public policy of permitting the State to negotiate enforceable multiyear collective bargaining agreements with unions of state employees, and the award furthers the express constitutional policy forbidding the General Assembly from passing any acts, including insufficient appropriation bills, that impair the obligation of contracts." *Id.* ¶ 40.

¶ 20    The appellate court reversed the circuit court's judgment insofar as the circuit court vacated the arbitration award in part and modified the arbitration award. The appellate court remanded the matter to the circuit court with directions to confirm the award. *Id.* ¶ 42.

¶ 21    We allowed the State's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Jan. 1, 2015)) and allowed Illinois AFL-CIO to file a brief *amicus curiae* in support of AFSCME's position (Ill. S. Ct. R. 345 (eff. Sept. 20, 2010)).

¶ 22                                    ANALYSIS
¶ 23                                         I
¶ 24    Preliminarily, we address an issue raised *sua sponte* by the appellate court, namely, a potential conflict of interest. According to the appellate court:

> "Staff members working for all of the judges in this case belong to AFSCME, and the CBA at issue governs their relationship with the State. However, all judges in the state face the same conflict of interest. In this case, as in *Jorgensen v. Blagojevich*, 211 Ill.

---

[6]The parties later stipulated that expiring appropriations were sufficient to pay the wage increases to employees in the Human Rights Commission, but that wage increases totaling $52.8 million in the other five agencies remained unpaid.

2d 286, 298-99 (2004), '[w]ere we to recuse ourselves, the parties would therefore be left without a forum in which to review the circuit court's judgment. Their right to appeal would be lost. Under these circumstances, the common law "rule of necessity" obligates us to proceed.' " 2014 IL App (1st) 130262, ¶ 21.

¶ 25   The appellate court's concerns about a conflict of interest were unfounded. Judicial branch state employees working in the appellate court, as well as this court, are not members of AFSCME, and the CBA at issue here does not govern their relationship with the State. Thus, appellate court review was not dependent upon the rule of necessity.

¶ 26   With this correction, we turn to the substantive issues before this court.

¶ 27                                            II

¶ 28   Judicial review of an arbitrator's award is " 'extremely limited.' " *Griggsville-Perry Community Unit School District No. 4 v. Illinois Educational Labor Relations Board*, 2013 IL 113721, ¶ 18 (quoting *American Federation of State, County & Municipal Employees v. State*, 124 Ill. 2d 246, 254 (1988) (hereinafter *AFSCME v. State*)); *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 304 (1996) (hereinafter *AFSCME v. CMS*). Under this limited form of review, "a court is duty bound to enforce a labor-arbitration award if the arbitrator acts within the scope of his or her authority and the award draws its essence from the parties' collective-bargaining agreement." *AFSCME v. CMS*, 173 Ill. 2d at 304-05. This standard respects the parties' decision to have disputes settled by an arbitrator rather than a judge (*Griggsville-Perry Community Unit School District No. 4*, 2013 IL 113721, ¶ 18) and gives effect to the intent of the legislature in enacting the Uniform Arbitration Act (710 ILCS 5/1 *et seq.* (West 2014)), namely, "to provide finality for labor disputes submitted to arbitration" (*AFSCME v. CMS*, 173 Ill. 2d at 304). Whether an arbitrator's decision fails to draw its essence from the collective bargaining agreement presents an issue of law. *Griggsville-Perry Community Unit School District No. 4*, 2013 IL 113721, ¶ 20.

¶ 29   The State argues that the arbitrator's award did not draw its essence from the CBA because the arbitrator refused to give any effect to the parties' express agreement that the provisions of the CBA "cannot supersede law." The State posits that this provision limited the parties' contractual obligations to what is permitted by Illinois law, and necessarily embraced principles relating to the General Assembly's appropriation power, as set forth in section 21 of the Act and the appropriations clause. According to the State, the arbitrator improperly applied his own personal notion of fairness and justice in lieu of giving effect to the terms of the CBA.

¶ 30   AFSCME counters that the arbitrator based his decision upon well-established contract principles: the language in the CBA clearly set forth the wage increases that were required for fiscal year 2012; that language contained no contingencies based upon legislative appropriations; and, in the past, when the parties intended their agreement to be contingent on legislative appropriations, they had said so expressly.

¶ 31   To establish that the arbitrator strayed from his duty to interpret and apply the CBA and, instead, imposed his own notions of right and wrong, the State must clear " 'a high hurdle.' " *Griggsville-Perry Community Unit School District No. 4*, 2013 IL 113721, ¶ 20 (quoting *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 559 U.S. 662, 671 (2010)). The State must do more than demonstrate that the arbitrator committed an error, or even a "serious

- 6 -

error." *Id.* Rather, the State must show that "there is no 'interpretive route to the award, so a noncontractual basis can be inferred and the award set aside.' " *Id.* (quoting *Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1506 (7th Cir. 1991)). We agree with AFSCME that the State has not cleared this high hurdle.

¶ 32    In crafting his award, the arbitrator relied on what he described as the "mandatory, clear, and simple terms" of the collective bargaining agreement: "Effective July 1, 2011, the pay rates *** *shall* be increased by 4.00%." (Emphasis added.) "Shall," the arbitrator stated, means "must" or "obliged to." The arbitrator indicated that the cost savings agreements reduced the 4% wage increase to 2%, but did not change the mandatory nature of the State's obligation to pay the increase. The arbitrator determined that in order to find that the State can avoid paying the 2% increase, he would have to amend the language in the agreement from "shall" to "may" or add language making the State's payment of the wage increase contingent on legislative appropriation. Under article V of the CBA, however, "[t]he arbitrator shall neither amend, modify, nullify, ignore, add or subtract from the provisions" of the agreement. The arbitrator stated that "[w]hen parties to collective bargaining agreements agree that wage increases are contingent upon the existence of sufficient appropriations, they say so," but "[t]here is no language here to that effect."

¶ 33    With respect to section 21, the arbitrator noted that no reported case had interpreted this statutory provision and this was a matter for the courts. His only authority, the arbitrator explained, was to interpret the parties' agreement, and the parties had not specifically incorporated section 21 of the Act into the CBA. The arbitrator opined that even if he could interpret section 21, to do so in a fashion that would change the State's obligation to pay the 2% wage increase would violate article V of the CBA expressly prohibiting him from amending the parties' agreement.

¶ 34    The arbitrator also considered the "cannot supersede law" language on which the State relied. This language, the arbitrator began, was part of a larger section in article XXXIV of the CBA titled "Partial Invalidity." This section provides:

> "Should any part of this Agreement or any provisions contained herein be Judicially determined to be contrary to law, such invalidation of such part or provision shall not invalidate the remaining portions hereof and they shall remain in full force and effect. The parties shall attempt to renegotiate the invalidated part or provisions. *The parties recognize that the provisions of this contract cannot supersede law.*" (Emphasis added.)

¶ 35    The arbitrator observed that it had not been "[j]udicially determined" that the 2% wage increase was "contrary to law," and:

> "That is what the State is asking me to do. But I am not a judge. I am an arbitrator bound by the negotiated terms of the Agreement and the Cost Savings Agreements which require the State to pay the 2% increase and prohibit me as an arbitrator from changing that obligation."

¶ 36    Putting aside the lack of a judicial determination, the arbitrator next observed that, "[t]here is a fundamental rule of contract construction that specific language governs general language." Although the arbitrator cited no authority for this rule, "[c]ourts and legal scholars have long recognized that, where both a general and a specific provision in a contract address the same subject, the more specific clause controls." *Grevas v. United States Fidelity &*

*Guaranty Co.*, 152 Ill. 2d 407, 411 (1992). The arbitrator found that under this rule, the specific language in article V of the CBA, providing that he "shall neither amend, modify, nullify, ignore, add or subtract from the provisions" of the CBA, governs the general language that the provisions of the agreement "cannot supersede law."

¶ 37       Finally, the arbitrator concluded that he was without authority to consider the State's constitutional and public policy arguments:

> "Questions of public policy—like statutory and Constitutional interpretations—are for the courts and not arbitrators. And that makes sense. As an arbitrator, I am a private citizen who holds no elected or appointed authority by the citizens of this state. Our elected and appointed officials including lawmakers, administrators and judges—and not me—should make public policy decisions."

We note that although an arbitrator must respect public policy concerns implicated by his remedy, "[q]uestions of public policy, of course, are ultimately left for resolution by the courts." *AFSCME v. CMS*, 173 Ill. 2d at 318.

¶ 38       Based on our review of the arbitration award, we conclude that the arbitrator acted within the scope of his authority and that his award was guided by contract principles and not his own notions of fairness and justice. Accordingly, we reject the State's initial challenge to the arbitration award and hold, as a matter of law, that the award "drew its essence" from the CBA.

¶ 39                                                           III

¶ 40       The State next argues that the arbitration award must yet be vacated because it violates the public policy of this state.

¶ 41       An arbitration award which otherwise derives its essence from the collective bargaining agreement is not enforceable if the award contravenes paramount considerations of public policy. *AFSCME v. CMS*, 173 Ill. 2d at 306-07; *AFSCME v. State*, 124 Ill. 2d at 260. This public policy exception to the enforcement of arbitration awards finds its historical roots in the common law. *AFSCME v. CMS*, 173 Ill. 2d at 307. "[J]ust as we will not enforce a private agreement which is repugnant to established norms of public policy, we may not ignore the same public policy concerns when they are undermined through the process of arbitration." *Board of Trustees of Community College District No. 508, County of Cook v. Cook County College Teachers Union, Local 1600*, 74 Ill. 2d 412, 424 (1979). To vacate an arbitration award on this basis, a court first determines "whether a well-defined and dominant public policy can be identified" and, if so, "whether the arbitrator's award, as reflected in his interpretation of the agreement, violated the public policy." *AFSCME v. CMS*, 173 Ill. 2d at 307-08.

¶ 42       Because Illinois public policy finds expression, first and foremost, in our state constitution, we begin our analysis there, turning our attention to the appropriations clause. Set forth in the finance article, the appropriations clause provides in relevant part: "The General Assembly by law shall make appropriations for all expenditures of public funds by the State." Ill. Const. 1970, art. VIII, § 2(b). "An appropriation involves 'the setting apart from public revenue a certain sum of money for a specific object.'" *Board of Trustees of Community College District No. 508 v. Burris*, 118 Ill. 2d 465, 477 (1987) (quoting *Illinois Municipal Retirement Fund v. City of Barry*, 52 Ill. App. 3d 644, 646 (1977)). The power to appropriate for the expenditure of public funds is vested exclusively in the General Assembly; no other branch of government

holds such power. *McDunn v. Williams*, 156 Ill. 2d 288, 308 (1993). In the state budget-making process, for example, although the Governor is constitutionally required to set forth in his proposed budget "the estimated balance of funds available for appropriation" (Ill. Const. 1970, art. VIII, § 2(a)), and statutorily required to set forth "the amounts recommended *** to be appropriated to the respective departments, offices, and institutions" (15 ILCS 20/50-5(a) (West 2014)), the General Assembly alone has the authority to make any such appropriations (Ill. Const. 1970, art. VIII, § 2(b)).

¶ 43    In addition to our state constitution, Illinois public policy is shaped by our statutes, through which the General Assembly speaks. *Illinois State Bar Ass'n Mutual Insurance Co. v. Law Office of Tuzzolino & Terpinas*, 2015 IL 117096, ¶ 19 n.2. Indeed, as between the judicial branch and the General Assembly, the latter " 'occupies a superior position in determining public policy.' " *Id.* (quoting *Reed v. Farmers Insurance Group*, 188 Ill. 2d 168, 174-75 (1999)).

¶ 44    The Act reflects the public policy of this state, as determined by the General Assembly, "to grant public employees full freedom of association, self-organization, and designation of representatives of their own choosing for the purpose of negotiating wages, hours and other conditions of employment or other mutual aid or protection." 5 ILCS 315/2 (West 2012). This broad statement of public policy, however, is tempered by section 21 of the Act. 5 ILCS 315/21 (West 2012). Section 21, which has been a part of the Act since its enactment in 1983 (Pub. Act 83-1012, § 21 (eff. July 1, 1984)), states in its entirety:

> "§ 21. *Subject to the appropriation power of the employer*, employers and exclusive representatives may negotiate multi-year collective bargaining agreements pursuant to the provisions of this Act." (Emphasis added.) 5 ILCS 315/21 (West 2012).

¶ 45    The term "employer," as used in section 21, has always been expressly defined to include "the State of Illinois." Compare Pub. Act 83-1012, § 3(n) (eff. July 1, 1984), with 5 ILCS 315/3(o) (West 2014). Because, as discussed above, the appropriation power of the State resides with the General Assembly, under the plain language of section 21, multiyear collective bargaining agreements negotiated with the State, *i.e.*, the "employer," are subject to the State's appropriation power, as exercised by the General Assembly. Section 21 is thus consistent with the appropriations clause of the Illinois Constitution and reinforces the public policy of this state under which the power to appropriate for the expenditure of public funds is unique to the General Assembly.

¶ 46    The appellate court held, however, that because the statutory definition of "employer" expressly excludes the General Assembly (5 ILCS 315/3(o) (West 2014)), multiyear collective bargaining agreements with the State are not subject to the General Assembly's appropriation power. 2014 IL App (1st) 130262, ¶¶ 32-33. We disagree. This court has already recognized that the General Assembly's appropriation authority does not make that body an employer of executive branch employees. *Orenic v. Illinois State Labor Relations Board*, 127 Ill. 2d 453, 481 (1989). Accordingly, exclusion of the General Assembly from the definition of "employer" under the Act does not take collective bargaining agreements with the State outside of the reach of section 21.

¶ 47    Moreover, when the legislature amended the Act in 1988 to exclude the General Assembly from the definition of "employer," the legislature made plain its intent: "to specify that employees of the General Assembly of the State of Illinois *** are excluded from the Illinois

Public Labor Relations Act" (Pub. Act 85-1032, § 2 (eff. July 1, 1988)) and thus excluded from the right of self-organization and collective bargaining (*id.* § 1 (amending Ill. Rev. Stat. 1987, ch. 48, ¶ 1606)). Although AFSCME argues that section 21 should apply only to collective bargaining agreements with local governmental employers such as municipalities and counties, no such limiting language appears in the statute.

¶ 48     Despite the clear expression of public policy set forth in the appropriations clause and section 21 of the Act, AFSCME urges this court to hold that the CBA was not subject to the appropriation power of the General Assembly. AFSCME argues that if funding for wage increases in collective bargaining agreements is ultimately dependent on the spending decisions of the General Assembly, collective bargaining with the State is rendered meaningless.

¶ 49     AFSCME's argument is belied by its own bargaining history with the State. As AFSCME admits, some collective bargaining agreements have made wage increases expressly contingent on legislative appropriations. Thus, it is not the case that collective bargaining is rendered meaningless where the agreement is subject to the appropriation power of the General Assembly. The only difference between AFSCME's prior agreements and the present one is that the appropriation contingency in the prior agreements was express, whereas the appropriation contingency in the CBA was implied by virtue of section 21 of the Act.

¶ 50     We disagree with AFSCME that collective bargaining will be rendered meaningless if the CBA is subject to the General Assembly's appropriation power for the additional reason that this argument overlooks the difference between collective bargaining in the public sector versus the private sector. As our appellate court explained:

> "The courts have noted one important difference between collective bargaining in the public sector, as opposed to the private sector, is that in the public sector, it is often necessary for a labor union to, in effect, obtain approval of a proposed contract by a legislative body through appropriation of the funds required to provide the wage and salary increases called for by the contract, in addition to obtaining the assent of the employing governmental agency or department to the terms of the contract. Thus, public employee unions, as a part of their collective-bargaining duties, must often engage in political activities in order to achieve what most private sector unions are able to achieve solely at the bargaining table." *Antry v. Illinois Educational Labor Relations Board*, 195 Ill. App. 3d 221, 270-71 (1990) (citing *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977)).

¶ 51     This court has similarly recognized that when labor representatives bargain with executive agencies, they do so with the knowledge that any agreement reached will be affected by the General Assembly's appropriation power. *Orenic*, 127 Ill. 2d at 481 (citing Jan W. Henkel & Norman J. Wood, *Collective Bargaining by State Workers: Legislatures Have the Final Voice in the Appropriation of Funds*, 11 J. Collective Negotiations 215, 217 (1982)); see also *State v. Florida Police Benevolent Ass'n*, 613 So. 2d 415, 417-20 (Fla. 1993) (recognizing differences between public and private collective bargaining, and holding that public sector agreement was subject to appropriation power of the legislature). Thus, giving effect to the General Assembly's appropriation authority does not render collective bargaining with the State meaningless; rather, giving effect to the General Assembly's role recognizes an inherent feature of collective bargaining in the public sector.

¶ 52    The appellate court expressed concern that recognizing the appropriation contingency in this case "would allow the General Assembly in every appropriation bill to impair the State's obligations under its contracts," in violation of the contracts clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 16). 2014 IL App (1st) 130262, ¶ 39. The partial concurrence and partial dissent (dissent) shares the appellate court's concern, suggesting that under today's decision, the State may now avoid its contractual obligations simply by not making the necessary appropriations. *Infra* ¶ 69. This case, however, does not involve every species of contract with the State. Rather, this case involves a multiyear collective bargaining agreement that is, by statute, "[s]ubject to the appropriation power of the employer." 5 ILCS 315/21 (West 2014). Accordingly, the pay raises in the CBA were always contingent on legislative funding, and the failure of that contingency to occur cannot "impair" AFSCME's agreement with the State.

¶ 53    The appellate court acknowledged that a contract with the State could be subject to legislative appropriation without offending the contracts clause. The appellate court concluded, however, that such a contingency must be explicit. 2014 IL App (1st) 130262, ¶ 39. But under general principles of contract law, "statutes and laws in existence at the time a contract is executed are considered part of the contract," and "[i]t is presumed that parties contract with knowledge of the existing law." *Braye v. Archer-Daniels-Midland Co.*, 175 Ill. 2d 201, 217 (1997); see also *Local 165, International Brotherhood of Electrical Workers v. Bradley*, 149 Ill. App. 3d 193, 211 (1986). Here, section 21 of the Act, which sets forth the appropriation contingency, has been in effect continuously since the Act's adoption and is thus part of AFSCME's agreement with the State. That this is so is made all the more plain by article XXXIV of the CBA which expressly states that its provisions "cannot supersede law."

¶ 54    Finally, we disagree with the dissent that our decision creates uncertainty as to the State's obligations, generally, under its contracts. We reiterate that this case involves a particular contract: a multiyear collective bargaining agreement. Whether other state contracts with different provisions and different controlling law could also be subject to legislative appropriation without offending the contracts clause is not before us. The dissent's attempt to address those issues is ill-advised. See *People v. White*, 2011 IL 109689, ¶ 153 (courts of review should exercise judicial restraint, particularly when constitutional issues are involved, and not make unnecessary law).

¶ 55                                        CONCLUSION

¶ 56    For all the reasons discussed above, we hold that section 21 of the Act, when considered in light of the appropriations clause, evinces a well-defined and dominant public policy under which multiyear collective bargaining agreements are subject to the appropriation power of the State, a power which may only be exercised by the General Assembly. We further hold that the arbitrator's award, which ordered immediate payment of the 2% wage increase without regard to the existence of corresponding appropriations by the General Assembly, violated this public policy. Accordingly, we reverse the judgments of the appellate court and circuit court and vacate the arbitration award.

¶ 57    Judgments reversed.

¶ 58    JUSTICE KILBRIDE, concurring in part and dissenting in part:

¶ 59    I concur in parts I and II of the majority opinion. I disagree, however, with part III of the majority opinion. I would reverse the judgment of the appellate court and affirm the judgment of the circuit court. I would hold that the state employees' contractual rights to raises continues under the contract clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 16), even if that obligation cannot immediately be enforced because of lack of appropriations, and that public policy strongly favors holding the State to its contractual obligations.

¶ 60    The State seeks to extinguish completely state employees' contractual rights to their raises and not merely to establish that the contractual rights may only be enforced with sufficient legislative appropriation. I do not believe the appropriations clause of the Illinois Constitution (Ill. Const. 1970, art. VIII, § 2(b)) may be used by the State to frustrate its contractual obligations.

¶ 61    The circuit court held that the State had put forth a potential valid defense to the contract: the Governor lacked the power to pay the wage increases unless the General Assembly appropriated the necessary funds. The circuit court heard evidence on the issue of the sufficiency of state appropriations for the wage increases in question and held that the State had proved it did not have sufficient funds available to provide all wage increases due under the contract. The circuit court, therefore, reinstated and confirmed the arbitrator's award, with the exception that the State was "not required to pay all of the wage increases within 30 days."

¶ 62    The circuit court ruled that the State had a continuing obligation to pay the wage increases under the contract and that it was required to pay those increases when it was able. The circuit court ordered that, to the extent the expiring appropriations for fiscal year 2012 were not adequate to pay the wage increases in total, the State's "contractual obligation remains unsatisfied and continues until paid in full." The circuit court expressly stated that state employees who did not receive the 2% wage increase may file back wage claims from the "back wage fund" under applicable law. Significantly, the parties later stipulated that the expiring appropriations were sufficient to pay the wage increases to certain state employees. I agree with the circuit court's determination that the State's obligation to pay the raises is a continuing contractual obligation, even if it is not immediately enforceable.

¶ 63    The majority opinion ignores the circuit court's specific factual findings and the parties' stipulations. The majority opinion allows the State to extinguish state employees' contractual rights to the raises, while ignoring AFSCME's argument that the right to recover the negotiated raises at issue in this case is protected by the contract clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 16).

¶ 64    This court has made clear that the contract clause provides a high level of protection to those who contract with and work for the State. See *In re Pension Reform Litigation*, 2015 IL 118585, ¶¶ 64-65 (hereinafter *Heaton*). In *Heaton*, this court recognized "that particular scrutiny of legislative action is warranted when, as here, a State seeks to impair a contract to which it is itself a party and its interest in avoiding the contract or changing its terms is financial" and that "it is manifest that the State could not, as a matter of law, clear the threshold imposed under contemporary contract clause jurisprudence." *Heaton*, 2015 IL 118585, ¶¶ 63, 65. As this court pointed out in *Heaton*:

    "The circumstances presented by this case are not unique. Economic conditions are cyclical and expected, and fiscal difficulties have confronted the State before. In the

- 12 -

midst of previous downturns, the State or political subdivisions of the State have attempted to reduce or eliminate expenditures protected by the Illinois Constitution ***. Whenever those efforts have been challenged in court, we have clearly and consistently found them to be improper." *Heaton*, 2015 IL 118585, ¶ 53.

¶ 65    As AFSCME points out in its brief, if the legislature simply refused to appropriate funds to pay pension benefits to state employees, this court would presumably not conclude that the right of state employees to receive their full pensions had been eliminated by the General Assembly. Rather, the right to undiminished pensions would continue, and the obligation of the State to pay those pensions would continue, even if that obligation could not immediately be enforced.

¶ 66    Accordingly, I would find that the General Assembly's failure to appropriate sufficient funds to pay all of the salary increases did not erase the underlying obligation of the State. I would hold that state employees' contractual rights to raises continue under the contract clause, even if that obligation cannot immediately be enforced because of insufficient appropriations.

¶ 67    Many courts have recognized that while the lack of legislative appropriation may prevent enforcement of contractual rights against the government, the lack of appropriation does not eliminate the government's underlying contractual obligation. See *Salazar v. Ramah Navajo Chapter*, 567 U.S. ___, 132 S. Ct. 2181 (2012); *Newman Marchive Partnership, Inc. v. City of Shreveport*, 979 So. 2d 1262 (La. 2008); *White v. Davis*, 68 P.3d 74 (Cal. 2003); *AFSCME/Iowa Council 61 v. State*, 484 N.W.2d 390 (Iowa 1992); *Smith v. State*, 222 S.E.2d 412 (N.C. 1976); *Campbell Bldg. Co. v. State Road Comm'n*, 70 P.2d 857 (Utah 1937); *State v. Woodruff*, 150 So. 760 (Miss. 1933).

¶ 68    Moreover, public policy strongly favors holding the State to its contractual obligations. *AFSCME/Iowa Council 61*, 484 N.W.2d 390, is instructive and persuasive on this point. In *AFSCME/Iowa Council 61*, the Iowa Supreme Court faced a similar argument on the need for appropriations for enforcement of a collective bargaining agreement. In that case, the legislature passed the necessary appropriations, but the governor struck the appropriation funding. The Iowa Supreme Court recognized that the State is bound by its contracts and that the State cannot use the lack of appropriation to frustrate its contractual obligations. *AFSCME/Iowa Council 61*, 484 N.W.2d at 392-94. The Iowa Supreme Court determined that, although the governor's veto was valid, "the veto did not serve to erase the underlying obligation of the State." *AFSCME/Iowa Council 61*, 484 N.W.2d at 395. The Iowa Supreme Court aptly stated:

"It would be no favor to the State to exonerate it from contractual liability. To do so would seriously impair its ability to function. A government must finance its affairs, must contract for buildings, highways, and a myriad of other public improvements and services. It would lead to untenable results if a government, after having contracted for needed things, did not have to pay for them." *AFSCME/Iowa Council 61*, 484 N.W.2d at 394.

¶ 69    Similarly, when the State of Illinois does not fulfill its contracts, both employees and vendors suffer. There are sound fiscal reasons for holding the State to its contractual obligations. Stability in fulfilling state contracts benefits the citizens of this state. Indeed, allowing the State to extinguish contractual obligations by failing to appropriate funds is

fiscally dangerous. I do not believe the majority does the State any favor in exonerating it from contractual liability by simply failing to appropriate sufficient funds. This is especially true given the current budget crisis.

¶ 70        Today's decision may, in fact, further impair the State's ability to function. The State of Illinois must finance its affairs; purchase products and supplies; contract for public improvements, infrastructure, and various services, but, apparently, under the majority's approach, the State has no obligation to pay for those products, improvements, and services. Unfortunately, I believe the majority opinion interjects uncertainty into the State's responsibility for its contracts and will likely impair its ability to secure future contracts with its employees and vendors. Ultimately, the citizens, businesses, and taxpayers of the State will suffer the consequences.

¶ 71        For the foregoing reasons, I respectfully concur in part and dissent in part from the majority opinion.