979 So.2d 1262 (2008)
The NEWMAN MARCHIVE PARTNERSHIP, INC.,
v.
CITY OF SHREVEPORT.
No. 07-C-1890.
Supreme Court of Louisiana.
April 8, 2008.
*1263 Weems, Schimpf, Gilsoul, Haines, Landry & Carmouche, Carey Thomas Schimpf, *1264 Kenneth Patrick Haines, Brian D. Landry, Shreveport, for Applicant.
Weiner, Weiss & Madison, Michael Allyn Stroud, John M. Madison, Jr., Shreveport, for Respondent.
Frank J. Gremillion and Edmond Wade Shows, for City of Baton Rouge and East Baton Rouge Parish Amicus Curiae.
Richard Lee McGimsey, Hon. James D. Caldwell, and Lindsey K. Hunter, for State of Louisiana Amicus Curiae.
CALOGERO, Chief Justice.
We granted certiorari in this case to decide whether the judicial branch may, through a writ of mandamus, compel a political subdivision of the state to pay a judgment rendered against it when that subdivision has appropriated funds to an account established to pay claims and judgments against the subdivision, but not for the payment of that specific judgment. Because we hold that LSA-R.S. 13:5109(B)(2) requires a specific appropriation or disbursement of funds to pay a particular judgment, we find that the funds found in this account were "public funds" until they were to be paid by the entity managing that account, and, until that time, were not subject to seizure under the clear language of our state constitution. Accordingly, we reverse the decision of the court of appeal.

Factual and Procedural History
The genesis of this matter is a separate action where The Newman Marchive Partnership, Inc. ("Newman") sued the City of Shreveport ("the City") for breach of contract relative to renovations to Independence Stadium in Shreveport. After the trial court awarded Newman $251,304.34, the Court of Appeal, Second Circuit, amended the judgment by increasing it to $263,674.10 together with legal interest from the date of judicial demand, February 11, 2002. Newman Marchive P'ship v. City of Shreveport, 40,512, p. 18 (La.App. 2 Cir. 2/24/06), 923 So.2d 852, 855, 862. This court denied the City's writ application. Newman Marchive P'ship v. City of Shreveport, XXXX-XXXX (La.6/23/06), 930 So.2d 983.
When the City failed to pay the judgment, Newman brought the instant litigation, filing a Petition for Writ of Mandamus on September 19, 2006 to compel the City through its chief executive officer, then Mayor Keith Hightower, to pay the judgment. The trial court issued an alternative writ of mandamus directing the City to pay the judgment with interest by September 22, 2006, or show cause on September 25, 2006, why the writ should not be made peremptory. On September 22, 2006, the City made an unconditional tender to Newman of the principal amount of the judgment, but it refused at the same time to pay the legal interest, which amounted to $70,301.66. The City also filed exceptions and an opposition to Newman's petition.
At the mandamus hearing, the trial court denied the City's exceptions, but nonetheless found that mandamus was not appropriate and entered judgment recalling the alternative writ of mandamus and dismissing Newman's petition. On appeal, a three-judge panel of the Second Circuit affirmed the trial court's ruling, holding it lacked constitutional or statutory authority to compel the City to pay the entire judgment. Newman Marchive P'ship v. City of Shreveport, 42,073, p. 6 (La.App. 2 Cir. 8/22/07), 962 So.2d 1075, 1078-79. However, on rehearing a five-judge panel reversed the trial court and ordered that a peremptory writ of mandamus issue, requiring the mayor of Shreveport to pay the remainder of the judgment (the unpaid interest) from city funds. Id. at pp. 8-9, 962 So.2d at 1084-85. A divided court *1265 reasoned that, because the City had appropriated up to $15 million to a "Retained Risk Fund"  a fund established specifically to pay legal settlements and judgments  mandamus was appropriate. Id. at pp. 4-5, 962 So.2d at 1082-83. From that judgment, the City applied to this court for a writ of certiorari, which was granted. Newman Marchive P'ship v. City of Shreveport, XXXX-XXXX (La.11/21/07), 967 So.2d 527.

Discussion
This case requires us to interpret Louisiana constitutional articles and statutes relative to the enforcement of money judgments against a political subdivision of the state. Because the proper interpretation of a statute is necessarily a question of law, we apply a de novo standard of review. See Holly & Smith Architects, Inc. v. St. Helena Congregate Facility, Inc., XXXX-XXXX, p. 9 (La.11/29/06), 943 So.2d 1037, 1045.
We begin our analysis by referring in part to the framework of our state government. Article II, section 1 of the Louisiana Constitution establishes three distinct branches of government: legislative, executive, and judicial. Section 2 of that article provides: "Except as otherwise provided by this constitution, no one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others." La. Const. art. II, § 2. Thus, "[t]his trichotomous branching of authority furnishes the basis for the existence of an inherent judicial power which the legislative and executive branches cannot abridge." Hoag v. State, XXXX-XXXX, p. 4 (La.12/1/04), 889 So.2d 1019, 1022. Similarly, the judicial branch may not usurp those powers which are vested in the other two branches. Id.
The separation of powers is not always defined precisely, however. See id. at p. 8, 889 So.2d at 1024 ("Admittedly, there is some inevitable overlap of the functions"). Evidencing this is the clause at the beginning of article II, section 2  "Except as otherwise provided by this constitution"  a clause which establishes that the constitution in a separate provision may have one branch encroaching on another.
The constitution allocates the judiciary some power over the other branches through article XII, section 10(A), where it waives the State's immunity in suits in contract and tort. See Jones v. City of Baton Rouge, 388 So.2d 737, 740 (La.1980).[1] Thus, the judicial branch is empowered to render judgments against the state. Hoag, XXXX-XXXX, pp. 4-5, 889 So.2d at 1022. However, the constitution does not provide the judiciary with the ability to execute those judgments. The constitution reserves that power to the legislature:
[The legislature] shall provide a procedure for suits against the state, a state agency, or a political subdivision and provide for the effect of a judgment, but no public property or public funds shall be subject to seizure. The legislature may provide that such limitations, procedures, and effects of judgments shall be applicable to existing as well as future claims. No judgment against the state, *1266 a state agency, or a political subdivision shall be exigible, payable or paid except from funds appropriated therefor by the legislature or by the political subdivision against which the judgment is rendered."
La. Const. art. XII, § 10(C) (emphasis added). The legislature largely parroted this language when it enacted LSA-R.S. 13:5109(B)(2):

Any judgment rendered in any suit filed against the state, a state agency, or a political subdivision, or any compromise reached in favor of the plaintiff or plaintiffs in any such suit shall be exigible, payable, and paid only out of funds appropriated for that purpose by the legislature, if the suit was filed against the state or a state agency, or out of funds appropriated for that purpose by the named political subdivision, if the suit was filed against a political subdivision.

(emphasis added).
Admittedly, article XII creates a frustrating dichotomy for the state's judgment creditors. As one commentator remarked, "the apparent liberality of abolishing most immunity from suit was offset by the continuation of a severe limitation on a private citizen's ability to enforce a judgment against the state, a state agency, or a local governmental entity." Lee Hargrave, "Statutory" and "Hortatory" Provisions of the Louisiana Constitution of 1974, 43 La. L.Rev. 647, 653 (1983). Still, the combined effect of article XII, section 10(C) and LSA-R.S. § 13:5109(B)(2) is clear. Judgments against a political subdivision of the State may only be paid "out of funds appropriated for that purpose by the named political subdivision," LSA-R.S. 13:5109(B)(2); Hoag, XXXX-XXXX, p. 5, 889 So.2d at 1023, and under no circumstance shall "public property or public funds . . . be subject to seizure," La. Const. art. XII, § 10(C).
In Hoag v. State, we noted that Louisiana courts have repeatedly held that judgment creditors cannot compel political subdivisions to appropriate funds for the payment of a judgment rendered against that subdivision through a writ of mandamus. XXXX-XXXX, pp. 5-6, 889 So.2d at 1023 (citing Jones v. Traylor, 94-2520 (La.App. 4 Cir. 8/23/95), 660 So.2d 933; Landry v. City of Erath, 628 So.2d 1178 (La.App. 3 Cir.1993); Dep't of Transp. & Dev. v. Sugarland Ventures, Inc., 476 So.2d 970 (La.App. 1 Cir.1985); Fontenot v. State, 358 So.2d 981 (La.App. 1 Cir. 1978), rev'd on other grounds, 355 So.2d 1324 (La.1978)). The Hoag court observed that mandamus "is an extraordinary remedy, to be applied where ordinary means fail to afford adequate relief," and that "the only circumstances under which courts may cause a writ of mandamus to issue is where the actions sought to be performed by the legislature are purely ministerial in nature." Id. at p. 6, 889 So.2d at 1023 (citing La.Code Civ. Proc. art. 3863 et seq.). We further stated that a "ministerial duty" is one in which "no element of discretion is left to the public officer," in other words, "a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law." Id. at p. 7, 889 So.2d at 1024 (citing Franklin v. Massachusetts, 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992); Felix v. St. Paul Fire & Marine Ins. Co., 477 So.2d 676, 682 (La.1985); further citations omitted). In light of this standard, we concluded that the very act of appropriating funds is discretionary, making a writ of mandamus in this context an "impermissible usurpation of legislative power by the judiciary." Id. at pp. 7-8, 889 So.2d at 1024-25.
*1267 Nevertheless, Newman contends that this case is distinguishable from previous jurisprudence for two reasons. First, Shreveport's city council, the City's legislative branch, voluntarily enacted an ordinance that created a fund for payment of claims and judgments, the Retained Risk Fund. Second, the city council voluntarily chose to appropriate monies to that fund and no conditions were placed on the payment of final and definitive judgments. Thus, Newman avers that no "seizure" of "public funds" would occur in this instance, as these funds have been properly appropriated by the City's legislative branch specifically for the payment of final judgments. Newman concludes that once the city council appropriated sufficient funds to the Retained Risk Fund, the City had no discretion to refuse to pay the full amount of Newman's final and definitive judgment, and therefore a writ of mandamus may properly issue.
This argument carried the day with the court of appeal majority on rehearing. It held:
At the time this mandamus action was filed and tried, the legislative branch of city government had appropriated all the money needed to pay this judgment, but for whatever reason the executive branch refused to pay. Therefore, the judicial branch, through mandamus, may order that the legislative mandate be effectuated.
Newman Marchive P'ship, 42,073, p. 5, 962 So.2d at 1083.
Respectfully, we do not agree with this conclusion. As discussed above, the constitution delegated to the legislature the power to determine how money judgments rendered against the state would be executed. La. Const. art XII, § 10(C). The legislature acted on this authority when it passed LSA-R.S. 13:5109(B)(2), stating, "[a]ny judgment rendered in any suit filed against . . . a political subdivision . . . shall be exigible, payable, and paid only . . . out of funds appropriated for that purpose by the named political subdivision. . . ." (emphasis added). As Chief Judge Brown noted in the initial majority opinion from the court of appeal, this statute is phrased in the singular when it alludes to the purpose for which funds are appropriated. Newman Marchive P'ship, 42,073, p. 5, 962 So.2d at 1078. Thus, we also agree with Chief Judge Brown's interpretation that LSA-R.S. 13:5109(B)(2) envisions that whenever a judgment is rendered against the state, a state agency, or a political subdivision of the state, the judgment is payable only out of funds appropriated "for that purpose," i.e. money set aside specifically to satisfy a particular judgment. Id. This is in accord with what we previously stated in Hoag, that "La. R.S. 13:5109(B) is a clear expression of legislative intent; judgments rendered against the state are payable only by specific appropriation by the legislature." XXXX-XXXX, p. 5, 889 So.2d at 1023 (emphasis added).
Here, the money appropriated to the Retained Risk Fund was not a specific appropriation by the City's legislative branch to pay Newman's judgment. The record indicates that the money placed in the Retained Risk Fund was allocated by the city council; however, those monies were not earmarked to pay a specific claim, much less the Newman judgment.[2] *1268 Because LSA-R.S. 13:5109(B)(2) requires a specific appropriation of funds to pay a specific judgment, we conclude that prior to such an appropriation, the funds placed in the Retained Risk Fund were public funds of the City of Shreveport, a political subdivision of the state. Therefore, any judicial order compelling the City to pay those funds would constitute an unconstitutional seizure of public funds under La. Const. art. XII, § 10(C).
Moreover, the City of Shreveport's municipal ordinances[3] and the record[4] reveal that once funds were appropriated *1269 to the Retained Risk Fund, discretion remained with the Risk Management Committee to determine if those funds should be disbursed, how, when, and to whom. As discussed above, mandamus will only issue where the action sought to be compelled is ministerial in nature, i.e., where it contains no element of discretion. Because we find that the Risk Management Committee exercises discretion over how funds in the Retained Risk Fund are disbursed, we hold that mandamus is not proper in this circumstance.
To support its conclusion, the court of appeal relied on the 1878 case of State ex rel. Carondelet Canal & Navigating Co. v. Mayor & Administrators of New Orleans, where this court held that a judgment against the City of New Orleans could be enforced by mandamus. 30 La. Ann. 129, 132 (1878). However, Carondelet Canal *1270 involved a statute that provided for the registration of judgments against the city and ultimately required the mayor to allocate funds in the upcoming budget to satisfy a registered judgment that was not paid the year it was registered. Also, the constitution in force at the time Carondelet Canal was decided did not contain a prohibition against seizure of public funds as exists in our current constitution  a fact acknowledged by the court of appeal in footnote, see Newman Marchive P'ship, 42,073, p. 6 n. 5, 962 So.2d at 1083 n. 5. Therefore, because Carondelet Canal dealt with a statute and constitution that were substantially different from the ones relevant to this matter, we find that case distinguishable.[5]
Finally, we turn to the City's argument in its brief to this court that the mandamus order was issued to the wrong entity, and was thus legally flawed. The City asserts the Risk Management Committee, not the mayor, was the entity with power to disburse the funds. Having found that disbursement of the funds in the Retained Risk Fund was at the discretion of the Risk Management Committee, we conclude that a writ of mandamus is unsupportable irrespective of to whom it was issued. Accordingly, we pretermit further discussion of this issue.
We recognize, as have courts before us, that our holding today effectively provides Newman a right without a remedy. See Hoag, XXXX-XXXX, p. 8, 889 So.2d at 1025; Newman Marchive P'ship, 42,073, p. 3, 962 So.2d at 1080 (Sexton, J., concurring); Baudoin v. Acadia Parish Police Jury, 96-1288 (La.App. 3 Cir. 9/17/97), 702 So.2d 715, 720; Landry, 628 So.2d at 1179-80. This conundrum has not escaped the scrutiny of legal commentators. See, e.g. David W. Robertson, Tort Liability of Governmental Units in Louisiana, 64 Tul L.Rev. 857 (1990) ("The tort plaintiff who succeeds in an action against a governmental unit thus becomes a supplicant. . . . Meanwhile, legislative attention to the present dearth of judgment enforcement procedures is sorely needed."); Hargrave, supra; William Hardy Patrick III, Note, Enforcement of Judgments Against Governmental Entities: The New Sovereign Immunity, 37 La. L.Rev. 982 (1977). However, as the judicial branch, like all branches, derives its power from the constitution, we are bound to accept the limitations placed upon us by that document. Although article V, section 1 grants our branch the "judicial power"  a power which would seemingly carry with it the inherent ability to enforce judgments  the constitution otherwise limits that power when judgments are rendered against the state and its political subdivisions, and places enforcement of such judgments in the legislature.[6]
Thus, we have cause today to acknowledge the tenants of Marbury v. Madison: *1271 "Those then who controvert the principle that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution, and see only the law." 5 U.S. (1 Cranch) 137, 178, 2 L.Ed. 60 (1803). Although the context of Chief Justice Marshall's words was to explain that the legislature's power is bound by the federal constitution, today we observe that this bedrock principle  that the Louisiana constitution is the supreme law of our state  binds the judiciary as well.
In conclusion, we hold that LSA-R.S. 13:5109(B)(2) requires a specific appropriation of funds to pay a particular judgment before disbursement of those funds may be compelled by writ of mandamus. Prior to such an appropriation, the funds remain "public funds," and any effort by the judiciary to direct their disbursement would constitute an unlawful seizure of public funds under La. Const. art. XII, § 10(C). Therefore, Newman may not compel the City through a writ of mandamus to pay its judgment in this circumstance, because the funds allocated to the Retained Risk Fund were not a specific appropriation of funds to pay Newman's judgment.

Decree
The judgment of the Court of Appeal is reversed. The peremptory writ of mandamus is dissolved, and the Plaintiff's petition is dismissed.
REVERSED; WRIT OF MANDAMUS DISSOLVED; PETITION DISMISSED.
NOTES
[1] This is not to suggest that prior to the current constitution the state enjoyed sovereign immunity. See generally, David W. Robertson, Tort Liability of Governmental Units in Louisiana, 64 Tul. L.Rev. 857, 858-62 (1990) (chronicling the efficacy of tort suits against the state from 1854 until the adoption of the 1974 constitution).

Also, we acknowledge that article XII, section 10(C) was amended in 1995 to allow the legislature to limit the liability of the state, a state agency, or political subdivision. See La. Const. art. XII, § 10, Historical Notes.
[2] At the mandamus hearing, Mayor Keith Hightower testified as follows:

[On cross examination, counsel for Newman]: And the City Council has what you call retained risk fund?
[Mayor Hightower]: That's correct.
Q: That is a large pool of money, correct?
A: That's correct.
Q: That money is used to pay claims and judgments against the City, is it not?
[continued next page]
[from previous page]
A: Correct.
Q: The council votes to put that money in the fund, does it not?
A: Yes.
Q: They appropriate that money for that fund?
A: That's correct. (R. at 66)
. . . .
[On direct, counsel for the City]: Mr. Mayor, are you aware of any City Council action specifically appropriating money to pay the Newman Marchive judgment?
A: No. All City Council action has been to the pool. (R. at 71-72)
. . . .
[After developing testimony about a pending city council resolution that would require the City to pay the entire judgment, principal and interest, in the Newman case]
Q: If that resolution is passed by the City Council will you agree with me that money is appropriated to pay that judgment?
A: Yes (R. at 73)
Tom Cody, the Risk Manager for the City, also testified:
[On direct, counsel for the City]: Was there ever any money specifically appropriated by the City Council to pay the judgment in the Newman Marchive Partnership case?
[Tom Cody]: No, sir.
[3] We are aware that Shreveport's current municipal code governs the Risk Retention Fund. See Shreveport, La., Code of Ordinances §§ 26-171 to -176. However, as those ordinances were adopted on September 26, 2006, seven days after Newman filed its petition for mandamus on September 19, they do not apply here. See State v. Estate of Davis, 572 So.2d 39 (La. 1990).

The ordinances pertaining to the Retained Risk Fund are found in Division 3 of Chapter 26 of Shreveport's Code. The "Editor's note" to those ordinances states, "Formerly, division 3 pertained to [a] similar subject and derived from the Code of 1971, §§ 2-111 [to] 2-114, and Ord. No. 58 of 1995, adopted May 23, 1995." Those ordinances provide, in pertinent part:
The director of finance is hereby authorized to establish the retained risk fund as a separate fund . . . and to set forth such rules and regulations regarding the operation of the fund and expenditures from the fund as he deems necessary and appropriate.
Shreveport, La., Code of Ordinances (of 1971) § 2-113 (superceded).
[4] At the mandamus hearing, Mayor Hightower testified as follows:

[On cross, Counsel for Newman]: No council vote was required for you to authorize the payment of those funds?
[Mayor Hightower]: No, but Council was.
The risk management committee had
[continued next page]
[from previous page]
met and voted. (R. at 68)
. . . .
Q: If you had directed the City to pay the seventy thousand dollars in interest no vote of the City Council would have been required, would it?
A: It wouldn't but it would have been me going against the decision of the risk management committee to have done that.
Q: If you had told the City to pay the seventy thousand dollars there would have been no new money that would have had to be appropriated to pay that seventy thousand dollars, would it?
A: There would have been no new money appropriated, but I didn't have the authority to tell myself or anyone else to write that check. We have procedures to go through and the risk management committee is that procedure. They voted not to pay the interest, to pay the principle [sic] only and that was what was done. (R. at 69) (emphasis added)
. . . .
Q: Can you think of any legitimate reason why the Court should not order you to pay, the City to pay the seventy thousand dollars in interest?
A: It's just a personal opinion, but I do think a muncipality, [sic] whoever is in charge and whatever the procedures are there to protect taxpayer money and get the best deal possible for the taxpayer no matter what the situation might be. My understanding is that municipalities, cities, parishes, the State itself have that protection and that discretion. And that's what the risk management committee has chosen to exercise. (R. at 69-70)
. . . .
Q: Mr. Mayor, is it the policy of the City of Shreveport not to pay interest?
A: We don't have a specific policy. Our policy is that the risk management committee assesses and determines what the City will pay, what they won't pay, when they will pay. But as far as actual ordinance or resolution, no, there is not a specific City policy. It's all within the risk management committee. (R. at 71) (emphasis added)
. . . .
[On direct, Counsel for the City]: There remains the discretion of payment from any of those funds, is that correct?
A: That's true
Q: Am I correct that the mayor of the City of Shreveport is not on the risk management committee?
A: Correct.
Q: You play no role in the decision making of the risk management committee?
A: Correct. (R. at 72)
From Tom Cody's testimony:
[On cross, Counsel for Newman]: If the mayor directed the finance office to issue a check to the Newman Marchive Partnership to pay seventy thousand dollars in interest do you know of anything that the risk management committee could do to stop that action?
[Tom Cody]: The mayor doesn't have the authority to issue a check in such a case if the risk management committee has already determined what will be paid on a particular case. (R. at 77)
. . . .
[On direct, Counsel for the City]: When you have money in the retained risk funds does it remain the City of Shreveport's money?
A: Yes, sir.
Q: And is there a discretionary mechanism creating an ordinance that decides how those funds are going to be paid?
[continued next page]
[from previous page]
A: Yes, sir.
Q: You talked about that a little earlier. That's by the risk management committee?
A: Yes, sir, for claims over ten thousand dollars.
Q: You sit on that risk management committee?
A: I'm the chairman. We have two councilmen that are appointed by the City Council, the CAO [Chief Administrative Officer], the City attorney, the director of finance.
Q: And that committee met on the Newman claim, did it not?
A: Yes, sir.
Q: And the decision was made to only pay the principle [sic] amount of the judgment of that claim correct?
A: Yes, sir. (R. at 79-80)
. . . .
[On recross, Counsel for Newman]: So the City Council wasn't required to take any other action with respect to the payment of those funds?
A: Not once the risk management committee had made the determination to pay that. (R. at 81)
[5] The court of appeal also cited Barrett v. City of New Orleans, an 1881 decision of this Court. 33 La. Ann. 542 (1881). Because Barrett interpreted the same statute that was the focus of Carondelet Canal, we find it distinguishable from the instant matter for the same reasons we distinguish Carondelet Canal.
[6] In Baker v. Carr, the Supreme Court of the United States explained that where there exists a "textually demonstrable constitutional commitment of the issue to a coordinate political department," the issue is a "political question" and is not justiciable (except instances where it is alleged that the "action of [the legislature] exceeds whatever authority has been committed"). 369 U.S. 186, 210, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Here the constitution has clearly committed to the legislative branch the question of how judgments against the state are to be enforced; therefore, courts are restrained from exploring the appropriateness of the legislature's decision in this matter.