McCALLUM, J.
This appeal calls for us to consider two similar yet contrasting issues. First, the trial court has granted a preliminary injunction against a public subdivision. In essence, the trial court has exercised a unique power wherein it ordered and prevented another government entity from taking certain actions. Second, is a complex issue involving the fundamental division of governmental power. Essentially, we are tasked with deciding whether the trial court overstepped its constitutional authority when it granted a writ of mandamus, an extraordinary remedy, ordering a political subdivision to pay a judgment.
The City of Sterlington appeals the judgment of the trial court, asserting two errors: (1) the trial court erred in granting the Greater Ouachita Water Company a preliminary injunction against the City of Sterlington; and (2) the trial court erred when it granted a writ of mandamus in favor of the Greater Ouachita Water Company against the City of Sterlington. The City of Sterlington argues that the trial court erred in granting the preliminary injunction because the Greater Ouachita Water Company failed to show any possibility of irreparable injury. The City of Sterlington further contends that the trial court had no authority in granting the writ of mandamus where it had yet to appropriate any funds to pay the judgment in question.
The Greater Ouachita Water Company counters that the trial court did not err. It argues that that it did not need to show the possibility of irreparable injury. It further urges that Louisiana Revised Statute 19:201 authorized the trial court to issue the writ of mandamus at issue. Additionally, the Greater Ouachita Water Company *1260 requests that we increase the award of attorney fees and court costs to include this appeal.
For the following reasons, we affirm the trial court's judgment as to its grant of the preliminary injunction and we reverse the trial court's judgment as to its grant of the writ of mandamus.
FACTS
On June 17, 1996, the City of Sterlington ("Sterlington") entered into an agreement with the Greater Ouachita Water Company ("GOWC"). The agreement, titled ORDINANCE NO. 96-02 (UTL) ("Ordinance Agreement"), granted GOWC, for a period of twenty years, "a non-exclusive franchise ... for the construction, maintenance and operation of a water system including the production, transmission, distribution and sale of water in, through, across and beyond the Town of Sterlington[.]" Within the agreement, Sterlington further authorized GOWC the right to "construct, maintain and operate a system of pipes, pipelines, water mains, laterals, conduits, feeders, regulators, meters, fixtures, wells, storage facilities, connections and attachments and other instrumentalities and appurtenances[.]"
Between June of 1996 and November of 1998, Sterlington installed water mains in the Town of Sterlington for fire protection, a 150,000-gallon elevated storage tank ("water tower") and a pumping station. By agreement ("Water Tower Agreement") executed on November 1, 1998, Sterlington granted GOWC exclusive use of the water mains, water tower and pumping station. Furthermore, as consideration for the agreement, GOWC assumed full responsibility and liability for the maintenance, operation and upkeep of the water mains, water tower and pumping station. GOWC further agreed to hold Sterlington free of any and all liability and responsibility connected to the use of the water mains, water tower and pumping station. The agreement was executed and effective to June 17, 2016, the same date the Ordinance Agreement was set to expire.
Prior to the expiration date of the Ordinance Agreement and the Water Tower Agreement, Sterlington and GOWC entered into an Asset Purchase Agreement ("APA").[1] With a desire to own and operate its own water distribution system, Sterlington executed the APA on April 9, 2015, with GOWC. For the consideration of $ 2,600,000.00, Sterlington agreed to purchase all of GOWC's infrastructure within a specified area, detailed within the APA. Furthermore, within the APA, the parties agreed to the following notable terms and conditions, to wit:
Section 7.01 Conditions to Obligations of All Parties.[2] The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:
...
(e) Buyer shall have completed construction of the water treatment plant to serve the customers within the Area and shall have completed all construction necessary to tie the water treatment plant into Seller's existing water distribution system in the Area.
Section 9.01 Termination. This Agreement may be terminated at any time prior to the Closing:
...
*1261 (c) by Seller by written Notice to Buyer if:
(i) Seller is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure cannot be cured by Buyer by the Drop Dead Date[.][3]
Section 9.02 Effect of Termination. In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become null and void, except as provided below, and the following shall apply:
...
(c) Buyer and Seller shall sign a new franchise agreement for a term of twenty (20) years; and
(d) Buyer and Seller shall sign a new agreement allowing Seller to use the 8" and 6" fire mains and the 150,000 gallon elevated tank and pumping station owned by Buyer for a term of twenty (20) years.
Section 10.11 Specific Performance. The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.
By letter dated April 12, 2017, GOWC terminated the APA with Sterlington. Citing Article VII, Section 7.01(e), GOWC notified Sterlington of the termination due to the fact that Sterlington had failed to construct a water treatment plant or any of the infrastructure required to connect the plant to the water distribution system. GOWC further noted that the Drop Dead Date had passed and that Sterlington had failed to perform in accordance with the APA as a whole. Additionally, it notified Sterlington that due to the termination, Sterlington was required to promptly enter into the necessary agreements to renew or extend the franchise and use agreements as provided in Article IX, Section 9.02 of the APA. Thereafter, GOWC provided an agreement for the extension of the franchise and use agreements to Sterlington.
Refusing to sign GOWC's extension agreements, Sterlington instead filed an expropriation action against GOWC. Alleging significant residential and commercial growth and GOWC's failure to satisfy such needs, Sterlington sought to gain by expropriation the same infrastructure, from GOWC, which it failed to acquire with the APA, for $ 1,400,000.00.
GOWC countered Sterlington's expropriation cause with an exception of prematurity. GOWC argued that because Sterlington did not own or operate the necessary treatment plant required for a proper and safe water distribution system, then expropriating the infrastructure from GOWC would be premature. The trial court, agreeing with GOWC, granted its exception and dismissed Sterlington's cause of action. Sterlington did not appeal the trial court's decision. Thereafter, GOWC filed a motion to tax fees and costs, requesting $ 59,231.98 in attorney fees and costs it incurred while challenging Sterlington's expropriation suit.
Prior to the trial court hearing on the motion to tax fees and costs, GOWC determined that the water tower had a design *1262 flaw. In seven letters from the State of Louisiana Department of Health, dated from September 11, 2014, to August 25, 2015, the State informed GOWC that the water tower chlorine residual level had fallen below the Louisiana State Sanitary Code's acceptable levels. After years of mitigating the problem with temporary remedies, GOWC grew concerned for the safety and drinkability of the water. The temporary remedies further caused GOWC concern because they hampered the ability of GOWC to provide appropriate amounts of water for fire protection. On June 29, 2017, the State authorized and granted a permit for GOWC to make the necessary changes to ensure the safety of the water. On August 19, 2017, GOWC notified Sterlington of its intent to improve the water tower. To prevent stagnation of the water, and to improve the chlorine residual levels, GOWC determined that it needed to install a chlorine booster and recirculation equipment. Such improvements would ensure safe drinking water while at the same time allow GOWC to maintain proper water levels for fire protection.
On the date GOWC scheduled the installation of the modifications, September 5, 2017, Sterlington denied GOWC contractors access to the water tower. After Sterlington threatened to arrest the contractors for trespass, the contractors left the site, failing to install any of the improvements to the tower. Thereafter, GOWC filed for injunctive relief against Sterlington, including a motion for a preliminary injunction.
On September 21, 22 and 25, 2017, the trial court held a hearing on the motion to tax fees and costs, attendant to defending the expropriation suit. The court further accepted evidence and testimony in conjunction with the motion for preliminary injunction. GOWC produced the letters from the State of Louisiana Department of Health. It further presented the testimony of four witnesses and experts as to the need for improvements to the water tower.
Ultimately, the trial court ruled in favor of GOWC on both matters. It awarded GOWC $ 57,641.98, with judicial interest, against Sterlington, for attorney fees and court costs. It granted the preliminary injunction that GOWC sought against Sterlington. Sterlington did not appeal the trial court's ruling with regard to the award for attorney fees and court costs. It did appeal the trial court's grant of the preliminary injunction.
Thereafter, Sterlington failed to pay GOWC in accordance with the judgment for fees and costs. GOWC then petitioned the trial court for a writ of mandamus against Sterlington. At the hearing on the mandamus, Sterlington argued that the trial court lacked the authority to grant such a writ where the city had yet to appropriate any funds for the payment of the judgment. GOWC argued that Louisiana Revised Statute 19:201 gave the trial court authority to grant a writ of mandamus. Agreeing with GOWC, the trial court granted the writ of mandamus, ordering the mayor of Sterlington to pay $ 58,421.42 to GOWC.
Consequently, Sterlington appealed both the trial court's decision in granting the preliminary injunction and the trial court's decision in granting the writ of mandamus.[4] GOWC counters that we should affirm the trial court and also increase the award of attorney fees and costs to include their cost to defend this appeal.
DISCUSSION
Preliminary Injunction
Louisiana Code of Civil Procedure Article 3663 provides injunctive relief to two *1263 classes of petitioner. Article 3663 states the following:
Injunctive relief, under the applicable provisions of Chapter 2 of Title I of Book VII, to protect or restore possession of immovable property or of a real right therein, is available to:
(1) A plaintiff in a possessory action, during the pendency thereof; and
(2) A person who is disturbed in the possession which he and his ancestors in title have had for more than a year of immovable property or of a real right therein of which he claims the ownership, the possession, or the enjoyment.
Louisiana Code of Civil Procedure Article 3601(A) states, "An injunction shall be issued in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law[.]" Typically, a trial court may grant a preliminary injunction where a party makes a showing of three things: (1) that the injury, loss or damage he will suffer if the injunction is not issued may be irreparable; (2) that he is entitled to the relief sought; and (3) that he is likely to prevail on the merits of the case. See Meredith v. I am Music, LLC. , 2018-0659, 2019 WL 610224 (La. App. 1 Cir. 2/13/19) ; See Denta-Max v. Maxicare Louisiana, Inc. , 95-2128 (La. App. 4 Cir. 3/14/96), 671 So.2d 995.
"A preliminary injunction is a procedural device interlocutory in nature designed to preserve the existing status pending a trial of the issues on the merits of the case." Smith v. West Virginia Oil & Gas Co. , 373 So.2d 488, 494 (La. 1979). "[T]he grant or denial of a preliminary injunction is left to the sound discretion of the trial court and will not be disturbed on appeal except for a clear abuse of that discretion." Cason v. Chesapeake Operating, Inc. , 47,084 (La. App. 2 Cir. 4/11/12), 92 So.3d 436, 441, writ denied 2012-1290 (La. 9/28/12), 98 So.3d 840.
In a recently rendered and still unpublished opinion, the First Circuit Court of Appeal of Louisiana elucidated the difference between a prohibitory injunction and a mandatory injunction. "A 'prohibitory injunction' is one that seeks to restrain conduct; a 'mandatory injunction,' on the other hand, commands the doing of some action." Meredith, 2019 WL 610224 at 4-5 ; see Denta-Max, 671 So.2d at 996-97. "The level of proof required and the procedure used to satisfy these three elements differs depending on whether the preliminary injunction sought is a prohibitory or a mandatory injunction." Meredith, 2019 WL 610224 at 4-5 ; see Denta-Max, 671 So.2d at 996-97. Where a prohibitory injunction simply preserves the status quo until a full trial on the merits, a court may issue the injunction on a prima facie showing by the party seeking the injunction. See Meredith, 2019 WL 610224 at 4-5 ; See Denta-Max, 671 So.2d at 996-97.
In the case before us, the trial court held a hearing on GOWC's request for a preliminary injunction. After allowing testimony and taking evidence, the trial court granted the preliminary injunction on December 4, 2017. The Honorable Judge Alvin Sharp considered the testimony of experts with knowledge of the water tank at issue, evidence of the concerns of GOWC and the agreements entered into by both parties allowing GOWC to use and operate the water tower. The court further considered documents showing multiple periods where the chlorine residual level had fallen below the Louisiana State Sanitary Code's acceptable levels.
Although the trial court did not specify its reasoning as to whether it was granting the preliminary injunction based on a prima facie showing or a showing of irreparable injury, we find that the court did not abuse its broad discretion in granting the preliminary injunction. GOWC made a *1264 showing that irreparable injury could occur in the form of civil liability to itself from the public at large through both the possibility of unsafe drinking water and the decreased availability of necessary fire protection. GOWC also made a showing of past instances where the current configuration of the water tower in question failed to maintain the acceptable levels as required by the Louisiana State Sanitary Code.
Furthermore, it is notable that Sterlington has never prevented GOWC from operating and maintaining the water tower in connection with its responsibility to provide drinking water to the public. It has merely sought to stop GOWC from improving the tower so that it may appropriately function as intended, i.e. to provide potable water. In essence, Sterlington has not sincerely challenged the right of GOWC to use the water tower for the city's benefit. Instead, it has objected to and prevented GOWC from maintaining the water tower because, to its disadvantage, such actions would increase the price of the water tower with regard to the expropriation.
Within every previous agreement between the parties, however, GOWC's right to use and maintain the tower never included Sterlington's direction or oversight of how it could use the water tower. Indeed, Sterlington specifically demanded, within each agreement, that it shall not be liable for any problems with the water. Instead, it ensured that GOWC would assume all liability and responsibility for the maintenance, operation and upkeep of the water mains, water tower and pumping station.
The first and only time that Sterlington denied access to the water tower was after the trial court issued adverse rulings on motions and petitions brought by GOWC. The timing of such an action by Sterlington contributes to the seemingly arbitrary nature of its actions as opposed to a legitimate defense of its ownership of the water tower. Such indirect implication of the arbitrary nature of Sterlington's actions further highlights the status quo of GOWC's complete control and right of use of the water tower in question. Considering the actions of Sterlington, discussed supra , and that the trial court held a full evidentiary hearing on the matter, it is difficult for us to find that the trial court's grant of the preliminary injunction was an abuse of the broad discretion that it enjoys in such a matter.
Moreover, this Court decided a similar case in Monroe Real Estate & Development Co., Inc. v. Sunshine Equipment Co., Inc., 35,555 (La. App. 2 Cir. 1/23/02), 805 So.2d 1200. In Monroe , the trial court denied a request for a preliminary injunction. The appellant held an option on a contract that had yet to be proven as satisfied or valid because the trial on the merits was still pending. This Court decided the following, to wit:
For purposes of the proof required for a preliminary injunction, this evidence is sufficient to establish that the Agreement contemplated transfer of ownership of the easement to Sunshine following its valid exercise of the option. Upon proof of these facts, it logically follows that Sunshine's successful proof of a claim to ownership of the real right of specific performance resulting from an asserted exercise of the option necessarily results in a corresponding claim to ownership of the easement, which in this case is appropriately classified as a predial servitude - a real right which may also be protected by La. C.C.P. art 363 preliminary injunction. Id. at 1204.
Reversing the trial court, this Court granted the preliminary injunction because the appellant presented prima facie proof of its claims to ownership or possession of a *1265 real right. Much like in Monroe, the evidence is sufficient to establish that the APA contemplated the continuation of GOWC's right to use and control the water tower in question following GOWC's valid exercise of terminating the APA.
We find that GOWC has put forward prima facie evidence of a right to the continued use of the water tower through the APA. Additionally, considering the status quo of the parties prior to the incident necessitating the cause for a preliminary injunction and a possibility of irreparable harm, we find that the trial court did not commit error in granting the preliminary injunction. Therefore, we affirm the trial court's granting of the preliminary injunction.
Mandamus
Under Title III, "Extraordinary Remedies," one finds Article 3862 of the Louisiana Code of Civil Procedure. That Article, titled "Mandamus; issuance of" states the following:
A writ of mandamus may be issued in all cases where the law provides no relief by ordinary means or where the delay involved in obtaining relief may cause injustice; provided, however, that no court shall issue or cause to be issued a writ of mandamus to compel the expenditure of state funds by any state department, board or agency, or any officer, administrator or head thereof, or any officer of the state of Louisiana, in any suit or action involving the expenditure of public funds under any statute or law of this state, when the director of such department, board or agency or the governor shall certify that the expenditure of such funds would have the effect of creating a deficit in the funds of said agency or be in violation of the requirements placed upon the expenditure of such funds by the legislature.
"Mandamus is a writ directing a public officer ... to perform" "a ministerial duty required by law." Jazz Casino Company, L.L.C v. Bridges , 2016-1663 (La. 5/3/17), 223 So.3d 488, 492. "A 'ministerial duty' is one 'in which no element of discretion is left to the public officer,' in other words, 'a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law.' " Id. at 492 (citing Hoag v. State , 2004-0857 (La. 12/1/04), 889 So.2d 1019.) "If a public officer is vested with any element of discretion, mandamus will not lie." Id. at 492 (citing Landry v. City of Erath , 628 So.2d 1178 (La. App. 3 Cir. 1993) ).
Normally, a district court's findings of fact in a mandamus proceeding are subject to a manifest error standard of review. See St. Bernard Port, Harbor and Terminal District v. Guy Hopkins Construction Co., Inc. , 2016-0907 (La. App. 4 Cir. 4/5/17), 220 So.3d 6. In this case, however, we must interpret Louisiana Revised Statute 19:201 in relationship to the enforcement of a money judgment for attorney fees and court costs against a political subdivision of the state. Where statutory interpretation is at issue and since the correct interpretation of a statute is naturally a question of law, we apply a de novo standard of review. See Newman Marchive Partnership, Inc. v.City of Shreveport , 2007-1890 (La. 4/8/08), 979 So.2d 1262 ; Quality Design and Const. Inc. v. City of Gonzales , 2013-0752 (La. App. 1 Cir. 3/11/14), 146 So.3d 567.
Similar to the case before the Newman Marchive Court, GOWC does not argue that Sterlington's decision to appropriate funds to pay a judgment against the city is not discretionary. GOWC instead argues that since Louisiana Revised Statute 19:201 mandates that the attorney fees and court costs be paid from the funds appropriated for the expropriation, then the appropriation for the original, unsuccessful expropriation statutorily includes any future *1266 judgment of attorney fees and courts costs. Essentially, GOWC contends that La. R.S. 19:201 is the appropriation itself because it mandates attorney fees and court costs shall be paid from the original expropriation funds.
In several opinions, the Supreme Court of Louisiana has succinctly outlined the constitutional concerns as relates to the judiciary's power to issue mandamus. The Constitution of Louisiana established three individual, distinct and separate branches of government: the executive, the legislative and the judicial. "Except as otherwise provided by this constitution, no one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others." La. Const. art. II § 2. Such branching and separation provides the inherent basis that no one branch may infringe or usurp the powers of the others. See Newman Marchive , 979 So.2d at 1265. Therefore, just as the legislative and executive branches may not seize the authority and power of the judiciary, the judiciary may not usurp the powers of the legislative and executive branches. Id.
However, "[t]he separation of powers is not always defined precisely." Id. at 1265-66. For example, "[t]he constitution allocates the judiciary some power over the other branches through article XII, section 10(A), where it waives the State's immunity in suits in contract and tort." Id. at 1266. "Thus, the judicial branch is empowered to render judgments against the state." Id. at 1266.
Furthermore, the legislature has enacted other statutes, broadening the power of the judiciary in very specific and strict situations. One such statute forms GOWC's alleged basis and argument for such power of the judiciary. Louisiana Revised Statute 19:201(A) states the following:
A court of Louisiana having jurisdiction of a proceeding instituted by any expropriating authority referred to in R.S. 19.2 shall award the owner of any right, or title to, or interest in the property sought to be expropriated such sum as will, in the opinion of the court, reimburse such owner for his reasonable attorney fees, and court costs, actually incurred because of the expropriation proceeding, if the final judgment is that the plaintiff does not acquire at least fifty percent of the immovable property requested in the petition for expropriation or if the proceeding is abandoned by the plaintiff. If the expropriating authority is the state or its political corporations or subdivisions, any such award shall be paid from the same funds from which the purchase price of the property would have been paid.
Therefore, the legislature has clearly authorized the judiciary to award a judgment for attorney fees and courts costs against a political subdivision involving matters of expropriation. Again, we note that Sterlington has not appealed the trial court's judgment for attorney fees and court costs. Rather, it has appealed the trial court's grant of the mandamus, ordering Sterlington to pay the judgment.
On that note, we are reminded that the power of the judiciary to award a judgment against a political subdivision and the power of the judiciary to enforce such a judgment are two entirely different matters. "[T]he constitution does not provide the judiciary with the ability to execute those judgments. The constitution reserves that power to the legislature." Newman Marchive , 979 So.2d at 1265 (citing La. Const. art. XII, § 10 (C).
Louisiana Constitution Article XII, § 10 (C) states the following:
[The legislature] shall provide a procedure for suits against the state, a state *1267 agency, or a political subdivision and provide for the effect of a judgment, but no public property or public funds shall be subject to seizure . The legislature may provide that such limitations, procedures, and effects of judgments shall be applicable to existing as well as future claims. No judgment against the state, a state agency, or a political subdivision shall be exigible, payable or paid except from funds appropriated therefor by the legislature or by the political subdivision against which the judgment is rendered. (emphasis added).
Adopting similar language, the legislature enacted Louisiana Revised Statute 13:5109 (B)(2), which states the following:
Any judgment rendered in any suit filed against the state, a state agency, or a political subdivision , or any compromise reached in favor of the plaintiff or plaintiffs in any such suit shall be exigible, payable, and paid only out of funds appropriated for that purpose by the legislature, if the suit was filed against the state or a state agency, or out of funds appropriated for that purpose by the named political subdivision, if the suit was filed against a political subdivision. (emphasis added).
In considering such language, the Newman Marchive Court held that "the combined effect of article XII, section 10(C) and LSA-R.S. § 13:5109(B)(2) is clear. Judgments against a political subdivision of the State may only be paid 'out of funds appropriated for that purpose by the named political subdivision.' " Newman Marchive, 979 So.2d at 1267. " La. R.S. 13:5109(B) is a clear expression of legislative intent; judgments rendered against the state are payable only by specific appropriation by the legislature." Id. at 1267 (citing Hoag v. State , 2004-0857 (La. 12/1/04), 889 So.2d 1019.)
GOWC argues that since La. R.S. 19:201 specifies that the judgment "shall be paid from the same funds from which the purchase price of the property would have been paid," the legislature is essentially stating that the funds to pay such a judgment are already appropriated by the political subdivision. Therefore, GOWC concludes that since the funds are already "appropriated," then the duty of the public officer to pay such judgment is not discretionary. Instead, it is a ministerial duty. Ergo, the trial court had the authority to issue the mandamus, directing Sterlington to pay the judgment. We disagree with such an interpretation of La. R.S. 19:201.
After a pedantic review of the instructive jurisprudence on the matter of mandamus, we conclude that the opinions where a judgment or order of mandamus was held valid and constitutional are distinguishable to this case. Further, the jurisprudence where courts have found mandamus unconstitutional have many similarities to the facts at issue before us.
One case that has the "sheep's clothing" of similarity, yet, on closer inspection, is a "wolf" among the herd, is Jazz Casino Company, L.L.C v. Bridges , 2016-1663 (La. 5/3/17), 223 So.3d 488. In Jazz , the Supreme Court of Louisiana found that a writ of mandamus was a valid exercise of the judiciary's power. The Jazz Court dealt with the constitutional and statutory duties owed by the tax collector in connection with the taxpayer's refund judgment. The Court ultimately reversed the appellate court and reinstated the judgment of the trial court, granting the writ of mandamus.
The Jazz Court first detailed the mandatory nature of the payment of a tax refund. "While having the power to tax, the legislature must 'provide a complete and adequate remedy for the prompt recovery of an illegal tax paid by a taxpayer.' " Id. at 492-93 (citing La. Const. art. VII § 3 (A) ). One such remedy for an "illegal tax," provided for by the legislature, *1268 was the "Overpayment Refund" procedure. Id. With regard to that procedure, the Court noted that the "legislature enacted procedures to authorize the return of overpaid taxes without requiring a legislative appropriation." Id. at 493. The Court then stated the following, to wit:
Where there has been a determination that an overpayment has been made, La. R.S. 47:1621(D)(1) directs that the refund of overpaid taxes "shall be made out of any current collections of the particular tax which was overpaid." The refund of overpayments that occurred in multiple years may be refunded "incrementally" by the Secretary; however, "[t]he number of increments shall not exceed the total number of years the tax was overpaid." La. R.S. 47:1621(D)(2). Within 45 days of the finality of a refund judgment in a Section 1621 proceeding, "the secretary shall make the refund." See La. R.S. 47:1621(D)(3). For incremental refunds, "[t]he first payment owed ... shall be made within" 45 days of the judgment becoming final. La. R.S. 47:1621(D)(3) and (4). Id. at 494.
In concluding that a court may issue a mandamus under La. R.S. 47:1621, the Jazz Court held the following, to wit:
In exercising the legislative authority to 'determine when and how to pay' a judgment against the state, a state agency, or political subdivision and to provide 'a complete and adequate remedy for the prompt recovery of an illegal tax paid by a taxpayer,' the legislature made the refund of tax overpayments mandatory. Accordingly, the legislature afforded the judiciary authority to issue a mandamus in a proceeding under La. R.S. 47:1621, to compel enforcement of a final refund judgment. Id. at 496.
The Court further stated that "the legislature expressly authorizes the use of mandamus relief to compel the Secretary to 'promptly' ... make the refund' ... [a]s to hold otherwise would allow the Secretary to disregard mandatory obligations under La. Const. art. VII, § 3 (A) and La. R.S. 47:1621." Id. at 496.
In considering the Court's opinion in Jazz , we note considerable, distinguishing factors between the tax refund statutes and La. R.S. 19:201. First, although we concede that La. R.S. 19:201 clearly mandates that a trial court "shall award" attorney fees and court costs, such a mandate is not the same as authorizing or mandating that the trial court issue an attendant mandamus for the payment of such an award. Neither party contests that the trial court correctly awarded a judgment of attorney fees or court costs. Second, it is certainly accurate that La. R.S. 19:201 mandates from which funds the award shall be paid when it states, "any such award shall be paid from the same funds from which the purchase price of the property would have been paid." However, although the statute dictates the specific fund from which the judgment shall be paid, it does not expressly state that the judgment shall be paid immediately nor does it strictly mandate that any specific public official pay the award. Finally, whereas La. R.S. 47:1621 specifies payment within 45 days of judgment, no such time frame, much less adjectives such as "promptly" or "quickly," can be found in La. R.S. 19:201. We find the statutory language in La. R.S. 19:201 to sharply contrast with the language interpreted by the Jazz Casino Court where the Court found that the Secretary is compelled to "promptly ... make the refund." Here, we find no such mandate or language.
Furthermore, we must note that the Jazz Court did refer to expropriations while considering the mandamus issue before it. The Court referenced the similarity of the constitutional mandate to provide a refund for an illegal tax to the constitutional mandate of just and fair compensation *1269 for land that the government expropriates. "Because a claim for a refund of overpaid taxes involves the return of money belonging to the taxpayer that is being held by the Department, a proceeding under La. R.S. 47:1621, like an expropriation proceeding, implicates constitutional concerns involving the deprivation of property." Jazz at 497. The Court further delineated why the source or the "ownership" of the funds in question is important. "A distinguishing characteristic of the funds sought by Jazz is that these funds belong to Jazz; whereas, with a judgment in a tort or contract matter, the judgment creditor is attempting to collect funds the public body legally collected which have become public funds." Id. at 497.
In contrast to Jazz , the case before us involves neither the actual taking of property nor deprivation of such property. In fact, the judgment in question arose because the expropriation sought by Sterlington against GOWC failed. No taking occurred; therefore, no deprivation of property occurred. The constitutional provision providing for "just and fair" compensation was neither invoked nor applicable to the case at hand. The judgment resulted from the unsuccessful expropriation attempt. The evidence at trial shows that Sterlington has only appropriated the funds for the payment of a successful expropriation; it has not appropriated any funds for the specific payment of any other judgments. The language of the statute controls the source of the funds for payment, but stops short of authorizing mandamus.
We further highlight Parish of St. Charles v. R.H. Creager, Inc. , 10-180 (La. App. 5 Cir. 12/14/10), 55 So.3d 884, writ denied 2011-118 (La. 4/1/11), 60 So.3d 1250. In Creager , the Fifth Circuit Court of Appeal of Louisiana found mandamus to be a valid exercise of judicial power. In that case, the court referenced similar laws to the one it was considering, where the legislature strictly mandated that trial courts issue mandamus for the payment of judgments with regard to expropriations brought specifically by levee districts. That court then held that, "We find the wording of the expropriation laws and the constitution set forth by the legislature make payment of fair and just compensation mandatory and not discretionary." Id. at 892.
The facts in Creager and the facts in the case before us are distinguishable. The Creager opinion highlights that the legislature, when it deems necessary, specifically and expressly enacts language mandating that trial courts issue mandamus. For example, under Title 38, Chapter 4, Part V, titled, "Expropriation by Declaration of Taking," Louisiana Revised Statute 38:390 states the following:
A. If the amount finally awarded exceeds the amount so deposited, the court shall enter judgment against the levee district or levee and drainage district and in favor of the persons entitled thereto for the amount of the deficiency. The final judgment together with legal interest thereon shall be paid within sixty days after becoming final. Thereafter upon application by the owner or owners, the trial court shall issue a writ of mandamus to enforce payment.
For our case, we find no such language within La. R.S. 19:201.
We note the decision of the First Circuit Court of Appeal of Louisiana in State, Dept. of Transp. & Development v. Sugarland Ventures, Inc. , 476 So.2d 970 (La. App. 1 Cir. 11/22/85), writ denied 478 So.2d 909 (1985), as a contrasting opinion, where that court held mandamus to be not within the power of a trial court where the state had abandoned the expropriation. Much like the case at hand, Sugarland involved an unsuccessful taking of property. Id.
*1270 Similarities do exist between the issues of this case and those at issue in Newman Marchive Partnership, Inc. v. City of Shreveport , 2007-1890 (La. 4/8/08), 979 So.2d 1262. The Newman Marchive Court considered the validity of a writ of mandamus where the city of Shreveport had generally appropriated funds to pay judgments against it but had not specifically appropriated funds for each and every judgment. Although the general appropriation to pay judgments against the city existed, the procedure for appropriating funds for a specific judgment required that a committee scrutinize and then specifically appropriate the funds for each judgment. The Court held that where the committee had not specifically appropriated the funds for the judgment before it, then the mandamus was not valid because the city still held a discretionary power to pay the judgment. The Court declared that, " LSA R.S. 13:5109(B)(2) envisions that whenever a judgment is rendered against the state, a state agency, or a political subdivision of the state, the judgment is payable only out of funds appropriated 'for that purpose,' i.e. money set aside specifically to satisfy a particular judgment." Id. at 1267. " La. R.S. 13:5109(B) is a clear expression of legislative intent; judgments rendered against the state are payable only by specific appropriation by the legislature." Id. at 1267 (citing Hoag v. State , 2004-0857 (La. 12/1/04), 889 So.2d 1019 ).
It is clear that the legislature has not yet specifically authorized mandamus in this situation. Without such specific authority being given to the courts, we are reluctant to seize it.
Finally, we are compelled to quote the ever-cerebral words of the Supreme Court of Louisiana in Hoag v. State , 889 So.2d at 1024. The Hoag Court stated the following, to wit:
The Louisiana Constitution delineates the parameters of each branch of government. Admittedly, there is some inevitable overlap of the functions and each branch of government must strive to maintain the separation of powers by not encroaching upon the power of the others. Consequently, the inherent powers of the judiciary should be used sparingly and only to the extent necessary to insure judicial independence and integrity.
We decline to blur the lines between the several branches of government, weakening the thoughtfully crafted, necessary trichotomous branching of authority.
In consideration of the above, we find that the trial court had no constitutional authority in issuing the writ of mandamus in question. Although La. R.S. 19:201 does mandate that a trial court award attorney fees and courts costs in specific circumstances, it does not provide authority for the judiciary to issue writs of mandamus ordering the payment of such awards. Therefore, we reverse the trial court's judgment granting the writ of mandamus.
CONCLUSION
The judgment of the trial court, in granting the preliminary injunction, is AFFIRMED. The judgment of the trial court, in granting the writ of mandamus, is REVERSED. One-half of the appeal costs are assessed to GOWC. The other half of the appeal costs are not assessed. See La. R.S. 13:5112.
APPLICATION FOR REHEARING
Daniel Milton Moore III, Frances Jones Pitman, Jeanette Giddens Garrett, Shonda D. Stone, and Jay Bowen McCallum - Writing.
Rehearing denied.

On March 11, 2015, the parties entered into an interim agreement. The APA at issue extended and expanded that agreement between the parties.

Within the APA, Sterlington is referred to as "Buyer" and GOWC is referred to as "Seller."

Section 9.01(b)(i) of the APA defined the Drop Dead Date as two (2) years following the date of the Agreement. We note that the date, by that term, would have been approximately April 9, 2017.

We note that the Louisiana Municipal Association has filed an amicus curiae in support of Sterlington's position with regard to the issue of mandamus.